[No. 29387. *En Banc.* August 8, 1946.]

M. G. WALKER, *Respondent and Cross-appellant,* v. BARTLEY B. GILMAN, *Appellant.*[1]

[1]Reported in 171 P. (2d) 797.

*Wright & Wright*, for appellant.

*Vanderveer, Bassett & Geisness*, for respondent and cross-appellant.

ROBINSON, J.—M. G. Walker, the plaintiff below, rented an apartment from the defendant, Bartley B. Gilman. After surrendering it on defendant's demand, he brought this action, alleging that, during his tenancy, he had been

charged more than the lawful maximum rent authorized by the provisions of the Federal emergency price control act of 1942 (56 Stat. 23; 50 U.S.C.A. (App.), § 901 *et seq.*), and the regulations promulgated in pursuance thereof.

Under § 205(e) of the act [50 U.S.C.A. (App.), § 925e], one who is charged more than the applicable maximum legal price may bring an action against his vendor, or landlord, to recover fifty dollars with respect to each separate overcharge, or for treble the total amount of the overcharges, *"whichever is the greater."* As the plaintiff in this case alleged that he had been overcharged fifty dollars per month for seven consecutive months, treble the amount of the overcharge was obviously the greater, and was, therefore, if he proved his allegations, the legal measure of his recovery.

The defendant denied various allegations of the complaint and counterclaimed, alleging that the plaintiff and wife had seriously damaged the premises. The facts may be summarized as follows:

The defendant owned a two-story dwelling in the city of Seattle, within the Puget Sound rent control area established by regulation No. 20, issued May 27, 1942 (7 Fed. Reg. 4104). On April 1, 1941, the date upon which rents in the area were frozen by the regulation, the upper floor, which was fitted up as a furnished, or at least partly furnished, apartment, was rented for forty-five dollars per month. Under the Federal act, this was the maximum legal rent and would remain so unless and until altered by an order of the OPA authorities.

Prior to January, 1942, appellant installed French doors between the kitchen and dining room, a Murphy bed in the dining room, a new electric range, and some other new furniture. He also installed in the basement, but for the service of the entire house, a new automatic hot-water heater and a washing machine. He had no difficulty in renting the thus greatly improved apartment for seventy-five dollars per month. In July, 1942, he registered the apartment with the local OPA office, or attempted to do so, by filling out and

mailing the registration form provided for that purpose. This form he filled out, in part, as follows:

"Rent on April 1, 1941: $45 per month
Date first rented after such change: Jan. 1st, 1942
Rent on that date: $75.00 per month
The Maximum Legal Rent for this Dwelling Unit is: $90.00 per month."

He did not give the date first rented after April 1, 1941, and a number of other details required by the registration blank, but did write thereon:

"This was converted from a single unit to a double unit consisting of two bedrooms, all linen, dishes, cooking utensils, bedding & telephone service. Rented at present to two families of two each."

However, no data whatever was furnished as to the cost of these alterations and additions. This registration form is dated July 16, 1942, and is stamped on the back as having been received at the OPA office on that date. Three days thereafter, the plaintiff in this case moved into the apartment, at an agreed rental of seventy-five dollars per month. In December, 1942, he complained about his rental to the OPA. One of its investigators, a man named Lindville, called and examined the premises in January, 1943. According to his evidence, he then and there told Gilman that the legal rental was forty-five dollars per month. Gilman testified that he asked Lindville what the apartment was worth, that Lindville said, sixty-five dollars per month, and that defendant would hear from him later, but that he never did. He, however, subsequently testified, at another point in the trial, that the investigator called him by phone in January and told him the legal rent was forty-five dollars. We quote from his testimony:

"A. I received lots of telephone messages. Q. From the O. P. A.? A. Yes. Q. When did they begin? A. That began after the Walkers began to complain about their rent in January. Then this Lindville called me up and told me my rent would be $45.00. Well, that kind of rattled me. Well, I says, to him, 'In that case, then, send me some document or something so I will have it. I can't take your word over the

telephone to cut my rent. Anybody could tell me that.' So I disregarded it."

Either just before or just after Lindville's visit to the premises, Walker tendered a check for forty-five dollars to Gilman, which defendant refused. Walker then gave him a check for seventy-five dollars, which paid his agreed rental until February 19th. On January 23, 1943, Gilman served a notice on the plaintiff to quit and surrender the premises, in which notice it was alleged that plaintiff and wife had damaged the premises, had created nuisances by making loud noises at all times of day and night, and that Mrs. Walker had defecated on the basement floor. The Walkers moved out.

On the ensuing February 22nd, despite the fact that the OPA authorities had, as Gilman admitted, told him that the legal rental was forty-five dollars, Gilman rented the apartment to Lieutenant Pollick at seventy-five dollars per month. This action was begun by Walker on March 8th. On May 15th, another OPA representative examined the premises. Shortly after, the OPA notified Lieutenant Pollick that the maximum rental for the apartment was forty-five dollars per month. Pollick was pleased with the premises, liked the Gilmans, and was quite willing to pay seventy-five dollars per month. He went to the OPA authorities to intercede with them on behalf of the Gilmans, but was unable to persuade them to recede from the position they had taken. On his return, he talked the matter over with Gilman.

"He told me that I would either pay the $75.00 a month or get out, and that I would get out if I did not pay it. He told me further that he was not willing to accept the O.P.A. in this decision. I pointed out to him at that time that the O.P.A. was representing the government of the United States and that as an officer in the Army of the United States I could not violate a decision following a statute of that. When I took my oath, I took my oath to the constitution and the laws of the United States, and I could not and would not violate it. I offered at that time to Mr. Gilman to pay the $75.00 and to give them $45.00, the balance to be placed in escrow pending a court decision in the case."

On June 17th, Lieutenant Pollick wrote Mr. Gilman the following letter:

"On or about February 22, 1943, you rented to me under a month to month tenancy the upper duplex in the premises commonly known as 3928 and 3930 Hudson Street, Seattle, at an agreed rental of $75.00 per month. In accordance with the terms of the oral tenancy I have paid the rent to and including July 1, 1943.

"In view of a controversy which has arisen between you and the O.P.A., I desire to move from said premises on or before midnight July 1, 1943. I hereby expressly request you to waive the usual notice of termination of tenancy.

"Will you please acknowledge on the bottom of this letter your consent to my moving from said premises above designated."

Mr. Gilman consented to his surrendering the premises.

The original of the registration form sent by Gilman to the OPA on July 16, 1942, was introduced in evidence. On its face, it was stamped: "Void. Must be registered again. Return this form with your new registration."

Defendant and wife testified that they had not seen that document after mailing it on July 16, 1942, until it was introduced at the trial, and, moreover, that they had had no written or other notice from the OPA that the rental therein proposed was not approved. It was argued at the trial, and is contended here, that, under the circumstances, they had the right to assume that it was approved. However, the defendant's chief contention was, and is, that he had expended $1,585 in altering the premises and providing additional furniture and facilities after April 1, 1942, and was, therefore, clearly entitled to charge additional rent.

The cause was tried in the superior court on January 7, 1944. The trial judge was called upon to construe an extremely novel and complex Federal statute, so recently enacted that there were but few reported cases dealing with it, and practically none dealing with the intricacies of its administrative provisions. In a very real sense, he was pioneering in this field. In a long and carefully prepared memorandum decision, handed down on January 20, 1944, he discussed at length the claim of defendant, Gilman, that he

was, by the very terms of the OPA regulations, entitled to an automatic increase of rent because of the improvements he had made in and on the premises after the freeze date. After carefully quoting the pertinent regulations and analyzing the evidence as to this point, the trial judge, deciding that question on the merits, held that defendant was not entitled to an increase.

 We do not find it necessary, or even proper, to inquire whether or not that finding is sustained by a preponderance of the evidence. There are two reasons why this is so: First, the defendant's application for a raise in rent was denied by an order which, under the law, was not reviewable by any court whatsoever, other than the emergency court of appeals, sitting at Washington, D. C.; and, second, no proceedings were taken to review the order within the time specified in the act, and it had, therefore, become *res judicata* long before this case came to trial.

 The appellant secondarily contends that, having applied for an increase of rental to seventy-five dollars per month and having received no notice from the OPA authorities that the increase was not approved, he rightly assumed that it was, in fact, approved. The assumption was rather sudden; for the application was mailed on July 16, 1942, and appellant rented the premises to plaintiff at the rate of seventy-five dollars per month within three days.

There is no merit in this contention, for other reasons. By force of the original basic "Regulation No. 20," the maximum, legal rental on July 16th, was without question the sum charged on the freeze date, which was forty-five dollars per month. The mere act of registering a higher rental could not change or increase it. We quote from the decision in *Hayes v. Osborn,* 195 Okla. 612, 160 P. (2d) 956:

"To hold that the act of registering a room at a price greater than that which by force of said regulation is the actual ceiling price is effective to change such ceiling, would supersede the requirements that modifications of basic rentals be had only on petition of landlord, and it was so held in *Henderson v. Morgan* (1943 D. C. Utah), 54 Fed. Supp. 441 (O.P.A. Service p. 622:72, and quoted in note 147 A. L. R. p. 1454). It was said:

" 'Registration certificates are required to put the rent director in possession of the facts in regard to the rental arrangements of each property, and be the better advised to take any action which he might desire to take. *But it in no way supersedes the requirement for the landlord to petition for modification of basic rentals, or to assume that such statements represent a satisfactory adjustment, if for any reason there is a desire for a change in the basic rent of any premises fixed as of March 1, 1942'.*" (Italics ours.)

It is said, in a *per curiam* opinion by the circuit court of appeals, first circuit, in *Thierry v. Gilbert,* 147 F. (2d) 603:

"The regulation clearly provides that where a landlord supplies furnishings and equipment in substantial addition to what he was supplying on the freeze date, he nevertheless may not increase the rent until he has applied for *and obtained* from the Office of Price Administration an upward adjustment of the maximum rent." (Italics ours.)

The rental of the apartment as of April 1, 1941, necessarily remained the maximum legal rental until changed by some order of the OPA authorities. The only order which was ever issued purported to be effective as of June 1, 1942, but in this order the maximum rent was fixed at the same amount as it was by the original regulation, that is, by "Regulation No. 20," issued on May 27, 1942. The order, issued June 15, 1943, read as follows:

"The Rent Director has duly considered the above matter and finds that:

"The Rent Director has considered your petition, and after due investigation of the matter, he finds that: Under Section 5 (d) of Maximum Rent Regulation No. 20, the rent on the maximum rent date was $45.00 per month.

"No major capital improvement has been completed as claimed on improper registration and no petition presented for additional services, therefore, present maximum legal rent is $45.00 per month.

"It is therefore determined that effective June 1, 1942, the Maximum Rent for the above accommodations was $45.00 per month."

(As hereinbefore noted, plaintiff's tenancy began on July 19, 1942.)

█ In prosecuting this appeal, the appellant is obviously faced with insuperable difficulties. First of all, no court, other than the emergency court of appeals created by the act and sitting in Washington, D. C., has jurisdiction to review, alter, amend, or set aside OPA orders.

In the case of *Desper v. Warner Holding Co.*, 219 Minn. 607, 19 N. W. (2d) 62, it appeared that, in the rental area involved, the rentals had been frozen at the amount charged on March 1, 1942. The landlord in that case, as the landlord did in this, moved additional furniture into the premises after that date, and thereupon, as the defendant landlord did in this case, demanded, and received, additional rent for the premises. Furthermore, he filed a petition with the OPA authorities, as the landlord did in this case, seeking the authorization of the additional rent. His petition was denied, as Gilman's was in this case. As to the point we are now discussing, the court said, in part:

"Defendant contended that because of better furnishings he was entitled to more than the maximum rent, . . .

"The validity of the maximum rent regulations of the Emergency Price Control Act of 1942 is not in question. Nor can the Minnesota courts pass upon the merits of a petition filed by defendant on July 20, 1943, to obtain an increase, nor upon the order denying such petition made on August 19, 1943, by said administrator. Sections 203 and 204 of the act indicate that Minnesota courts do not have jurisdiction for the determination of these questions. Section 204(d) provides:

" ' . . . The Emergency Court of Appeals, and the Supreme Court upon review of judgments and orders of the Emergency Court of Appeals, shall have *exclusive* jurisdiction to determine the *validity* of *any regulation* or *order* issued under section 2, of any price schedule effective in accordance with the provisions of section 206, and of any provision of any such regulation, order, or price schedule. Except as provided in this section, *no court, Federal, State, or Territorial, shall have jurisdiction or power to consider the validity of any such regulation, order, or price schedule, or to stay, restrain, enjoin, or set aside, in whole or in part, any provision of this Act authorizing the issuance of such regulations or orders, or making effective any such price schedule, or any provision of any such regulation, order, or price*

*schedule, or to restrain or enjoin the enforcement of any such provision.'* (Italics supplied.)

"Under the provisions of § 203, one desiring to contest the validity of a regulation applicable to him may file a protest with the price administrator, stating objections to the regulation or order, and may likewise file a petition for adjustment seeking an increase in his particular case. *Upon a denial thereof,* the complainant may file a protest with the *Emergency Court of Appeals* (§ 204[a]) 'to set aside such regulation, order, or price schedule, in whole or in part, to dismiss the complaint, or to remand the proceeding.' Such language effectively eliminates the jurisdiction of the state or other federal courts on such issues.

"The entire procedure contained in said sections, as well as the constitutionality of the act, has been upheld in the following cases: *Yakus v. United States,* 321 U. S. 414, 64 S. Ct. 660, 88 L. ed. 834; *Bowles v. Willingham,* 321 U. S. 503, 64 S. Ct. 641, 88 L. ed. 892; *United States v. Pepper Bros.* (3 Cir.) (1944) 142 F. (2d) 340; *Bowles v. Nu Way Laundry* Co. (10 Cir.) (1944) 144 F. (2d) 741; *Brown v. Warner Holding Co.* (D. C. Minn.) (1943) 50 F. Supp. 593. Accordingly, the validity of the act, as well as the merits of defendant's petition for an adjustment, is reserved exclusively to the administrative process, with judicial review lying in the *Emergency Court of Appeals* only, as provided by the act."

(The cases of *Yakus v. United States* and *Bowles v. Willingham,* cited in the paragraph last above quoted, are, of course, the leading cases construing the price control act. They were argued in the supreme court of the United States on the very day (January 7, 1944) that the instant case was tried in the superior court of King county. The trial judge, in the instant case, handed down his memorandum decision on January 20th. The supreme court opinions were not filed until March 27th. The trial judge, therefore, did not have the advantage of those opinions, nor, for that matter, of practically all of the other opinions quoted or cited herein.)

The procedure above set out in the quotation from *Desper v. Warner Holding Co., supra,* has been characterized in *Schaffer v. Leimberg,* 62 N. E. (2d) (Mass.) 193, as an

". . . ingenious legislative device . . . intended to make difficult any effective attack upon the constitutional

validity of any regulation made by the administrator under the authority of that act."

However, as we have already pointed out, this procedure has been held to be "due process" by the supreme court of the United States in the *Yakus* and *Willingham* cases.

*Secondly,* let us suppose that we had the power to set aside the order of June 15, 1943, or that we could plausibly, and probably soundly, conclude that the order could not be considered to affect this case in any manner, since it was not made or issued until after the plaintiff's tenancy had terminated. In what position would that leave appellant? Certainly, it cannot be contended that the court, after holding the order of no effect, could then go on and fix and establish the legal rental. That is unquestionably within the exclusive administrative power of the OPA authorities. In the absence of any other order—and there is no other order—it would necessarily be compelled to hold that the legal rental during Walker's tenancy was that fixed by the original OPA regulation; that is, the amount that was being charged on April 1, 1941, which, as we have seen, was forty-five dollars.

It, therefore, makes no difference whether the lawful maximum legal rental in this case was fixed by the order of June 15, 1943, or by the original regulation, since the amount is forty-five dollars in either case. The plaintiff was charged thirty dollars per month in excess of that amount for seven consecutive months, and is, therefore, legally entitled to recover his damages in this action, unless (1) we follow the supreme court of Rhode Island in holding, as it did in *Robinson v. Norato,* 43 A. (2d) (R. I.) 467, that it would not enforce § 205(e) of the Federal emergency price control act, or (2) refuse, for some adequate reason, to follow the decisions of the supreme court of the United States. In the interest of brevity, we set out the theory of the Rhode Island court decision in *Robinson v. Norato, supra,* by quoting from the [Atlantic Reporter] headnotes to the case:

"5. A state court would not enforce Federal Emergency Price Control Act by entertaining tenant's action against landlord for overcharges of rent, since act was penal, state

and United States were foreign to each other in sense of private international law, and supremacy clause of federal Constitution was inapplicable. Emergency Price Control Act of 1942, § 205 (e), 56 Stat. 33, 50 U.S.C.A. Appendix § 925 (e); U.S.C.A. Const. art. 6. .

"6. In the sense of public international law the several states of the Union are neither foreign to the United States nor foreign to each other, but this is not true in the field of private international law.

"7. The supremacy clause of the federal Constitution was intended to apply only in case of conflict between federal Constitution, acts and treaties and state Constitution and laws, and does not compel a state to provide, at its own expense, courts for enforcement of federal law which state deems penal. U.S.C.A. Const. art. 6."

The Rhode Island court holds the statute to be penal on account of the provisions of § 205 (e), which reads, in part, as follows:

"If any person selling a commodity violates a regulation, order, or price schedule prescribing a maximum price or maximum prices, the person who buys such commodity for use or consumption other than in the course of trade or business may bring an action either for $50 or for treble the amount by which the consideration exceeded the applicable maximum price, whichever is the greater, plus reasonable attorney's fees and costs as determined by the court. For the purposes of this section the payment or receipt of rent for defense-area housing accommodations shall be deemed the buying or selling of a commodity, as the case may be. If any person selling a commodity violates a regulation, order, or price schedule prescribing a maximum price or maximum prices, and the buyer is not entitled to bring suit or action under this subsection, the Administrator may bring such action under this subsection on behalf of the United States. Any suit or action under this subsection may be brought in any court of competent jurisdiction, and shall be instituted within one year after delivery is completed or rent is paid. . . ."

The opinion, in speaking of § 205 (e), says:

"It is possible under that section for a landlord, who may have overcharged a weekly tenant as trifling a sum as ten cents a week, to be mulcted in damages at the end of the year in the sum of $2,600, plus attorney's fees and costs, al-

though plaintiff's actual damages would be only $5.20 and costs. The $2,600 would be, in reality, punishment for the violation of the statute, that is, not in any sense compensatory damages but purely an arbitrary penalty totally unrelated to the real injury suffered by the plaintiff."

Although we have found no actual case as extreme as that above supposed, it must be conceded that such a case could easily arise, and that § 205 (e) would require the assessment of damages, as indicated. In *Lambros v. Brown,* 41 A. (2d) (Md.) 78, it appears that Brown was overcharged sixty-four cents for a one-fifth gallon of whisky, on one occasion, and forty cents, on another; while Waldman was overcharged forty-one cents on a similar purchase. Although Brown was actually overcharged but one dollar and four cents, in an action against the vendor he recovered judgment for one hundred dollars, and Waldman, who was actually overcharged but forty cents, recovered judgment for fifty dollars, or more than one hundred times the amount of the overcharge, and the judgments were affirmed on appeal.

In so far as we have been able to ascertain, by a thorough research of the decided cases to date, Rhode Island stands alone, among the states of the Union, in refusing to entertain actions for recovery of damages under § 205 (e) of the Federal emergency price control act.

In *Schaffer v. Leimberg, supra,* the municipal court of Boston had refused to entertain such a suit, and the appeal was from its judgment dismissing the action. Although, as we have already pointed out, the opinion in the case by the supreme judicial court of Massachusetts is sharply critical of the act, it nevertheless holds that it is the duty of the state courts to enforce it. The *Leimberg* case was decided on June 21, 1945, prior to the decision of the Rhode Island case. In rejecting the contention which the Rhode Island court approved a month later, the Massachusetts court said:

"Even if the rule that the courts of one sovereignty will not enforce penalties imposed by the laws of another applies to penalties imposed by the law of the United States,

the short answer to any objection founded on that rule is that a cause of action given to a person aggrieved to recover damages for the wrong done him is remedial and not penal within that rule even though the damages consist of a multiple of the actual loss or even are assessed without regard to the actual loss."

It seems evident that, if the Massachusetts court had held the act to be penal, it would nevertheless have directed its enforcement; for, it further said:

"However abhorrent to the Constitution of Massachusetts such a legislative device as that contained in the emergency price control act may be, nothing in our Constitution can be said to withdraw a case arising under that act from the jurisdiction granted to the Municipal Court of the City of Boston in general terms covering an action like the present. Where Congress has given to State courts jurisdiction of such sort as Congress has seen fit to give, to enforce an act of Congress, and those courts under State law have jurisdiction that enables them to enforce it, they are not at liberty, at least in civil proceedings, to decline to exercise that jurisdiction on the ground that the act of Congress is contrary to the public policy of the State or contravenes its Constitution or laws. *Within its field, Congress speaks for the whole nation and establishes a policy for every State that supersedes any local policy to the contrary. We think that the court be low was not at liberty to decline jurisdiction of the present case.*" (Italics ours.)

The theory upon which the supreme court of Rhode Island refused to entertain actions by tenants or purchasers of goods for recovery of damages, under § 205(e) of the Federal emergency price control act, has been advanced and rejected in many other courts. In *Beasley v. Gottlieb,* 131 N. J. L. 117, 35 A. (2d) 49, the court not only held that the act was not penal, but further said:

"Of course, the federal government is not a sovereignty foreign to this state. The laws of the United States are laws in the several states."

The supreme court of errors, in *Lapinski v. Copacino,* 131 Conn. 119, 38 A. (2d) 592, decided on the same day as the Massachusetts case (June 21, 1945), held that, since the recoveries provided for in § 205(e) were invoked by in-

dividuals for their private gain, the statute was at least not strictly penal. It also quotes at length, and with approval, from *Claflin v. Houseman,* 93 U. S. 130, 23 L. Ed. 833. A portion of this quotation is as follows:

"The laws of the United States are laws in the several States, and just as much binding on the citizens and courts thereof as the State laws are. The United States is not a foreign sovereignty as regards the several States, but is a concurrent, and, within its jurisdiction, paramount sovereignty. Every citizen of a State is a subject of two distinct sovereignties, having concurrent jurisdiction in the State,— concurrent as to place and persons, though distinct as to subject-matter. Legal or equitable rights, acquired under either system of laws, may be enforced in any court of either sovereignty competent to hear and determine such kind of rights and not restrained by its constitution in the exercise of such jurisdiction. . . . If an act of Congress gives a penalty to a party aggrieved, without specifying a remedy for its enforcement, there is no reason why it should not be enforced, if not provided otherwise by some act of Congress, by a proper action in a State court. *The fact that a State court derives its existence and functions from the State laws is no reason why it should not afford relief; because it is subject also to the laws of the United States, and is just as much bound to recognize these as operative within the State as it is to recognize the State laws. The two together form one system of jurisprudence, which constitutes the law of the land for the State; and the courts of the two jurisdictions are not foreign to each other, nor to be treated by each other as such, but as courts of the same country, having jurisdiction partly different and partly concurrent."* (Italics ours.)

In *Desper v. Warner Holding Co.* (May, 1945), 219 Minn. 607, 19 N. W. (2d) 62, in a syllabus prepared by the court, it is said:

"The recovery provided for under § 205 (e) in favor of the person injured is remedial rather than penal. In actions of this kind, whether the act be penal or remedial in nature, the United States is *held* not to be a foreign sovereignty attempting to enforce a penal statute, and in consequence state court had jurisdiction on this issue."

For other decisions to the same general effect, see: *Regan v. Kroger Grocery & Baking Co.,* 386 Ill. 284, 54 N. E. (2d)

210; *Miller v. Municipal Court,* 22 Cal. (2d) 818, 142 P. (2d) 297; *Lambros v. Brown,* 41 A. (2d) (Md.) 78.

We come now to the second reason which has been advanced as a bar to the plaintiff's recovery in this case. In spite of the decisions of the supreme court in the *Yakus* and *Willingham* cases, it is argued (though not by appellant's counsel) that no recovery whatever should be permitted, on the ground that the OPA act is not pursuant to the constitution of the United States, or, as the point is ordinarily expressed, that it is unconstitutional. We deem it not improper to say that some of the judges who sign this opinion, including the author thereof, believe that the act is unconstitutional, at least in so far as it arbitrarily restricts jurisdiction to question any administrative act done thereunder, or to review any order made pursuant thereto, to one single special court, to wit, the emergency court of appeals sitting in Washington, D. C.

As we have hereinbefore pointed out with great particularity, the law is so worded that neither the superior court in which this action was brought nor this court would have had the slightest power or jurisdiction to afford the appellant any relief in this cause, had he shown that he was indisputedly entitled to it. The amount involved is not large, but may have meant a great deal to him. But even if he had been able to safely navigate the summary and devious course of procedure provided in the act and had, in consequence, won a complete victory in the emergency court of appeals, it would have cost him far more than it was worth.

In a dissenting opinion in the case of *Di Santo v. Pennsylvania,* 273 U. S. 34, 43, 71 L. Ed. 524, 47 S. Ct. 267, Mr. Justice Brandeis said, Mr. Justice Holmes concurring: "In the case at bar, . . . the logic of words should yield to the logic of realities." The vast majority of cases, such as this, involve amounts less than a thousand dollars. In any case arising in the state of Washington involving a lesser sum, or for that matter arising in any state west of the Mississippi, the purported and pretended remedy provided by the act is so clearly valueless that it is, in the "logic of realities," no remedy at all.

It seems to some of us, when the private property of a citizen is summarily taken by an administrative officer of the government, and all courts, both state and Federal and of every kind and character within some thousands of miles from his place of abode, are absolutely forbidden to inquire into the matter, that, except in those comparatively few cases where large sums are involved, that property has been taken without due process, or, in short, has literally been confiscated. In alluding to that feature of the act, the supreme judicial court of Massachusetts, in its opinion in the *Leimberg* case, *supra,* after characterizing that procedure as

". . . an unusual and ingenious legislative device . . . intended to make difficult any effective attack upon the constitutional validity of any regulation made by the administrator under the authority of that act,"

went on to further say:

"The legislative plan plainly was intended to put in default the great mass of persons who might eventually come into conflict with any regulation made by the administrator, and to foreclose their right to object to it on constitutional grounds. That plan was highly successful. Only the most vigilant could preserve their right to be heard. Others had to obey, or pay the penalty, no matter how outrageously the regulation might violate their constitutional rights."

Nevertheless, that court felt compelled to follow the decisions of the supreme court of the United States and enforce the OPA act as a law made pursuant to the constitution of the United States, and, in the opinion of the majority of this court, so must we. There is nothing new in this situation. The deciding vote in the case of *O'Neil v. Building Service etc. Union,* 9 Wn. (2d) 507, 115 P. (2d) 662, 137 A. L. R. 1102, was cast under similar compulsion. The decision in *Weyerhaeuser Timber Co. v. Everett Dist. Council etc.,* 11 Wn. (2d) 503, 119 P. (2d) 643, would have been otherwise but for the fact that two of the judges of this court concurred in the result, solely because they felt bound to follow the decisions of the supreme court of the United States. See, also, *S & W Fine Foods v. Retail Delivery etc. Union,* 11 Wn. (2d) 262, 118 P. (2d) 962.

The framers of the Federal constitution took meticulous care to insure that a Federal law should be applied in the same manner and with the same meaning in every part of the Union by including therein the following portion of Art. VI:

*"This constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding."* (Italics ours.)

It has been urged, during our consideration of this case, that, if a judge of any inferior court sincerely and conscientiously believes that a Federal law is not made in pursuance of the constitution, it is not only his privilege, but his imperative duty, to refuse to enforce it, even though the supreme court of the United States has expressly held it to have been enacted "in pursuance thereof." This, it is said, he must do, in obedience to his judicial oath to protect and defend the constitution of the United States. Clearly, if that position be sound, there can be no "supreme law of the land." Under such a doctrine, a Federal enactment will be "law" in some states and not in others. Nor is this all. Within the states themselves it would be effective in some counties and not in others.

Furthermore, our some fifty superior court judges have taken an oath to protect and defend the constitution of the United States *and of the state of Washington.* When such a judge has conscientiously held an enactment of our state legislature to be void, as contrary to our state constitution, and is reversed on appeal by this court, is he to be permitted to deny a remedy to plaintiffs who come into court seeking relief under that enactment, and relegate them to shopping around among the different departments of the superior court—in an effort to find a judge with a different brand of conscience? Obviously, such a theory, if recognized and acted upon, can only lead to complete legal chaos. Moreover, it is directly antithetical to the principle that, in so

far as humanly possible, laws should be certain and of uniform application, as well as to our cherished belief that the ideal government is one of laws and not of men.

It is to be understood, then, that not all of the judges who sign this opinion are, as lawyers, convinced that the OPA act is constitutional. As judges, however, they are unanimous on the point that, since the United States supreme court had determined it to be constitutional, they must so consider it in arriving at their decision in this cause. Accordingly, upon the facts shown, we hold that the plaintiff herein is entitled to a recovery in some amount. We say "some amount" because he contends, by cross-appeal, that he is entitled to a greater amount than was adjudged by the trial court.

The assignments of error on cross-appeal are as follows:

"1. The trial court erred in refusing to grant judgment for treble the amount of the difference between the maximum legal rent and the rent actually paid by the plaintiff.

"2. The trial court erred in not allowing to the plaintiff an attorney's fee of more than $125.00."

■ The trial judge refused to award treble damages, assigning two reasons: First, he held, following *Brown v. American Stores, Inc.,* 32 A. (2d) (D. C.) 388, which was decided in the municipal court of appeals of the District of Columbia about six months before he prepared his memorandum decision, that the provision of § 205 (e), with relation to treble damages, was "permissive rather than mandatory," and, second, he doubted whether he could award treble damages in any event, in view of the fact that it is contrary to the general policy of the courts of this state to award punitive or exemplary damages. But it is said, in *Essig v. Keating,* 158 Wash. 443, 444, 291 Pac. 323:

"In this state, exemplary or punitive damages are not recoverable, *except in particular instances where the statute expressly so provides.*" (Italics ours.)

And at page 631, in the same volume of our state reports:

"It is not a case where punitory or exemplary damages are recoverable. *Damages of the latter sort are recoverable in this state only where the statute permits such a recovery.*"

(Italics ours.) *Ulvestad v. Dolphin*, 158 Wash. 629, 292 Pac. 106.

In 5 Washington Digest Annotated 47, under Key No. 87, nine other of our decisions are cited to the same effect. As indicated by the above quotations, we have state statutes providing for treble damages and enforce them according to their tenor.

■ Conceding, *arguendo*, that the treble damages prayed for in this action are punitive and exemplary, *they are expressly provided for by statute*. A grant of treble damages in this cause would, therefore, not have been contrary to our state policy, but directly in accord with it.

Finally, on this point, if a conflict existed, we would be in no position to engage in quibbles concerning state policy; for, we have hereinbefore *judicially* conceded that the price control law is constitutional, and by virtue of Art. VI of the Federal constitution, the judges of every state are bound thereby, ". . . anything in the constitution or laws of any state to the contrary notwithstanding."

Upon the facts, the plaintiff has the statutory right to recover $350 or $630, whichever is the greater. We cannot amend the Federal statute, or, while pretending to enforce it, limit plaintiff's recovery to but one third of the statutory amount.

■ In holding that the damage provisions of § 205 (e) were permissive, and not mandatory, on the authority of *Brown v. American Stores, Inc.*, *supra*, the trial judge was, of course, unaware of the fact that that identical case, under the caption "Bowles v. American Stores, Inc.," had been reversed by the municipal court of appeals of the District of Columbia a few days before he filed his memorandum opinion. The reversing opinion is reported in 139 F. (2d) 377. In that opinion, it was squarely and decisively held that the damage provisions of § 205 (e) are mandatory. On April 24, 1944, the supreme court of the United States refused to grant a writ of certiorari to review the decision. 322 U. S. 730, 88 L. Ed. 1565, 64 S. Ct. 947. So many other courts have held that the damage provisions of the act are

mandatory that we confine our citations to a few illustrative examples. See *Thierry v. Gilbert,* 147 F. (2d) 603, a decision of the circuit court of appeals of the first circuit; *Carmelly v. Hanson,* 133 N. J. L. 180, 43 A. (2d) 685; *Desper v. Warner Holding Co., supra,* and *Lapinski v. Copacino, supra.* We have examined the authorities up to the date of the preparation of this opinion (July 1, 1946), and find no unreversed decision to the contrary.

In *Kalwar v. McKinnon,* 152 F. (2d) 263, 265, decided on November 14, 1945, the most recent decision on the point which we have been able to find, the circuit court of appeals of the first circuit said, in part:

"The district court correctly applied the regulation and the mandatory provisions of the Act governing the amount of the tenant's recovery. Each of the nine monthly overcharges constituted a separate violation for which the statutory penalty of $50 was recoverable, making a total of $450. *Thierry v. Gilbert,* 1 Cir., 1945, 147 F. 2d 603. The result seems unduly severe—one might almost say, unconscionably so—under the facts of the particular case. The rigors of original § 205 (e) of the Act have wisely been mitigated by § 108 (b) of the Stabilization Extension Act of 1944, 58 Stat. 640, 50 U.S.C.A. Appendix § 925 (e), in the direction of giving a wider discretion to the court in fixing the amount of damages. Under that amendment, in circumstances like the present case, recovery would be limited to the amount of the overcharges—here $45—where the landlord's violation was neither willful nor the result of failure to take practicable precautions. Unfortunately for the present appellant, however, the violations in this case occurred prior to the passage of the Stabilization Extension Act of 1944, which, in this respect, has no retrospective application. *Desper v. Warner Holding Co., supra* [219 Minn. 607, 19 N. W. (2d) 62]."

The stabilization extension act was passed on June 30, 1944. Unfortunately for the present appellant, the violations in the instant case occurred long prior to that date. In fact, this cause was tried, appeal taken, and the transcript of record lodged in this court prior to June 30, 1944. The first assignment of error on cross-appeal is well taken.

 The cross-appellant contends that the court also erred in not allowing him an attorney's fee of more than one hundred twenty-five dollars. While, considering the work done, the allowance seems ultraconservative, we are unable.to find that the trial court abused its discretion. In fact, the allowance is in line with awards made in decisions of such cases in other jurisdictions. For example, in *Kalwar v. McKinnon*, from which we have just above quoted, the amount of the recovery was four hundred fifty dollars. The plaintiff was awarded an attorney's fee of seventy-five dollars in the district court, and twenty-five dollars in the circuit court of appeals, or one hundred dollars in all. In the instant case, the plaintiff will, under the decision we are about to render, ultimately receive a recovery of $552.75 (exclusive of attorney's fees). Proportionately, one hundred twenty-five dollars is to $552.75 nearly the same as one hundred dollars is to four hundred fifty dollars.

The judgment appealed from is reversed on plaintiff's cross-appeal. The cause is remanded to the superior court of King county for the entry of judgment in favor of cross-appellant for three times $210, that is, $630 less $77.25 (the amount found for defendant on his counterclaim for damages to his premises), plus an attorney's fee of $125; or, in all, for the sum of $677.75, and whatever costs are taxable in the lower court. The cross-appellant will also be allowed his costs in this court.

BLAKE, JEFFERS, MALLERY, and CONNELLY, JJ., concur.

BEALS, C. J. (concurring in part)—I concur in the majority opinion, save that portion thereof which directs that the amount of the recovery allowed cross-appellant be trebled.

SIMPSON, J. (dissenting)—My dissent is based upon three grounds:

(1) The statute bringing into being the bureau known as the office of price administration, is unconstitutional; (2) the courts of this state do not have jurisdiction to con-

sider questions such as presented in this case; and (3) appellant is entitled to prevail upon the merits as is disclosed by the evidence.

In support of the first ground I cite the decision of the superior court of Yakima county in the case of Kenyon v. Blackburn, written by Honorable N. K. Buck, judge of the superior court of Yakima county. In that case an action was instituted to secure the possession of an apartment in the city of Yakima. One of the issues raised was whether Congress had the authority to regulate rents and rental contracts between private citizens. In passing upon that issue the court stated:

"This court is mindful of the rightful place held by precedents and decisions of other courts, but such authority is, after all, limited and must give way to the fundamental law of the land. We have taken an oath of office to uphold the Constitution and the laws made in pursuance thereto. We remember that 'the judges in every state shall be bound thereby.' No one takes an oath of office to uphold the decisions of the courts, and to do so would be to exalt the lesser above the greater. From time to time cases arise in which the court must, if he keeps faith with his oath of office, disregard all judicial pronouncements and base his decision solely upon the American Constitution.

"This is such a case. The Constitution, when considered without regard to complex arguments as to construction, interpretation, implied powers and emergent necessity, is not difficult to understand. It should be read with this question in mind: Is the authority now under consideration granted to Congress anywhere in this instrument? If any such authority is found, the question is answered affirmatively. If it is not, then there is no such authority. Where language is plain, there is no room for judicial interpretation. The words speak for themselves. In the light of such truism, let us examine that fundamental law with reference to the present case.

"Article II, Section 2: 'The President shall be Commander in Chief of the Army and Navy of the United States * * * .'

"Article VI: 'This Constitution and the Laws of the United States which shall be made in pursuance thereof * * * shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby * * * .'

"Article X of the Amendments: 'The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.'

"Where in the enumerated powers given to Congress can there be found authority to regulate the terms and conditions under which a citizen may lease or cancel the lease of property? The answer must be that there is no such authority. There has, to be sure, arisen a myth as to the so-called emergency or war powers, but such conception is only a myth to any individual who frees his mind of cobwebs of labored and sophisticated dissertations on the synthetic intricacies of constitutional law. Our Constitution is in full force and effect during a war as it is in time of peace.

"Constitutional law is just like any other law, and to apply it, one must read the content, giving to each word its usual and accepted meaning and applying such language to the case at hand. Circumlocution and involved reasoning have no place in the application of the plain mandates of our fundamental law.

"If one be tempted into the realm of so-called constitutional construction, a few remarks are appropriate. It should be kept in mind that the first thing that the people did after adopting their fundamental law was to insist upon making certain restrictions upon the power of Congress so clear that no man could misunderstand. They intended that all general power should remain with the people, and to that end adopted Articles IX and X of the Amendments.

"Article X has been quoted above. That language is so clear that no layman can misunderstand it; but sometimes, by judicial interpretation, the inclusion of certain powers or duties is. construed to exclude all others. In order to avoid any such possible curtailment of the rights of the people, the framers and adopters of the amendments provided further in Article IX of those amendments: 'The enumeration in the Constitution of certain rights, shall not be construed to deny or disparage others retained by the people.'

"But nowhere can there be found similar language pertaining to the rights and powers of Congress. Its authority is specifically delegated and specifically limited. Nowhere does the Constitution say that the enumeration of certain rights and authority given to Congress shall not be con-

strued to deny or disparage others of a general nature which Congress might think it inherently possessed.

"Thus it is evident that by clear and precise language the Constitution withholds from Congress all authority over that wide field of human activities not specifically mentioned in that instrument; and, of course, included in that field are regulations as to rental of real estate or other property.

"One more word might be appropriate relative to the power of the government to carry on war. In order to effectively perform that duty, Congress, or the President as the Commander in Chief, can rightfully commandeer every building in the country; but that right does not give rise to authority to regulate the use of any property remaining in private hands, nor to limit the compensation which may be received by any citizen for his property.

"If emergency powers such as the one now under consideration are necessary, the remedy is by constitutional amendment. Until that is brought about, the courts can not do otherwise than to abide by the supreme law of the land as it stands."

The act under consideration is unconstitutional for another reason, and that is that the regulation which it undertakes exceeds the police power of the state and Federal government. It must be borne in mind that the act in question attempts to regulate the amount one can charge for the use of real property. In the following cases, this court has had occasion to examine the limitations imposed upon the legislative regulation supported by the police power of the state. These rules laid down by this court, to my mind, apply to the acts of Congress:

"The power of the legislature to make all needful rules and regulations for the health, comfort, and well-being of society cannot be questioned, but there are certain limits beyond which the legislature cannot go, without trenching upon liberty and property rights which are safeguarded by the state and Federal constitutions. As said by the court in *In re Jacobs*, 98 N. Y. 98, 50 Am. Rep. 636,

" 'The limit of the power cannot be accurately defined, and the courts have not been able or willing definitely to circumscribe it. But the power, however broad and extensive, is not above the Constitution. . . . Generally it is for the legislature to determine what laws and regulations

are needed to protect the public health and secure the public comfort and safety, and while its measures are calculated, intended, convenient and appropriate to accomplish these ends, the exercise of its discretion is not subject to review by the courts. But they must have some relation to these ends. Under the mere guise of police regulations, personal rights and private property cannot be arbitrarily invaded.' " *State ex rel. Richey v. Smith,* 42 Wash. 237, 84 Pac. 851.

"The courts will go far in sustaining the exercise of the police power for the preservation of the public health and safety, and in so doing private rights in conflict therewith are overridden; but on the other hand, the courts are equally concerned to see that, under the guise of protecting the public, private business—especially that carried on upon private property—is not arbitrarily restricted or interfered with.
. . .

"True we have said, in effect, that if a state of facts can be assumed which will justify the legislation, the court must assume that such a state of facts exists; but we have never said that, in a case involving the carrying on of a business, not harmful in itself, upon private property; and that should not be the rule in such a case. Where such private rights exist, the court should review the legislative action and determine whether the legislative body has imposed unnecessary restrictions upon a lawful occupation or a lawful right. McQuillin on Municipal Corporations, vol. III, § 893; *In re Jacobs,* 98 N. Y. 98, 50 Am. Rep. 636; *Ex parte Hayden,* 147 Cal. 649, 82 Pac. 315, 109 Am. St. 183, 1 L. R. A. (N. S.) 184; *State v. Wiggam,* 187 Ind. 159, 118 N. E. 684; *In re Steube,* 91 Ohio St. 135, 110 N. E. 250; *City of Zion v. Behrens,* 262 Ill. 510, 104 N. E. 836, Ann. Cas. 1915A, 1057, 51 L. R. A. (N.S.) 562.

"And so, coming to the provisions of the ordinance in question, we find that it forbids hawking, not only in the streets, alleys and public places, but on all private property as well. Unquestionably the ordinance is good as to the streets and public places, as we will assume that conditions justify the action of the legislative body in that respect. It might be that if hawking on private property closely adjacent to the public streets was forbidden, we might see in such a provision a reasonable exercise of the police power as tending to prevent the collection of crowds upon the streets and sidewalks about the open door of the place where the hawking was going on, or some similar obstruc-

tion to traffic or interference with the public safety. But that is not the question now before us. *Every one has a natural right to sell his own merchandise on his own private property, in his own way, to all who come there to buy; and if his manner of selling offends, those so offended may stay away. Self-interest would seem to be the only regulation needed in such cases.*" (Italics mine.) *Seattle v. Ford,* 144 Wash. 107, 257 Pac. 243.

"The same court in the case of *City of Aurora v. Burns,* 319 Ill. 84, 149 N. E. 784, uses this language:

" 'The police power, however, has constitutional limits, and any measure enacted or adopted in its exercise, to be sustained, must bear some reasonable relation to the purposes for which the power may be exercised. The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private rights. The legislative determination as to what is a proper exercise of the police power is not conclusive, but is subject to review by the courts. [Authorities.] If the means employed have no real, substantial relation to public objects within the state's power, or if those means are arbitrary and unreasonable, the judiciary will disregard mere forms and interfere for the protection of rights injuriously affected by such illegal action. [Authorities.]' " *Brown v. Seattle,* 150 Wash. 203, 272 Pac. 517.

If constitutional, legislation such as now before us presages extension of the police power which bids fair to take from our citizens all of the personal liberties and rights of private property hitherto considered to be guaranteed by our state and Federal constitutions.

"Liberty, in its broad sense as understood in this country, means the right, not only of freedom from actual servitude, imprisonment or restraint, but the right of one to use his faculties in all lawful ways, to live and work where he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or avocation." *In the Matter of Application of Peter Jacobs,* 98 N. Y. 98, 50 Am. Rep. 636.

1 Blackstone, Commentaries, 138, says that property "consists in the free use, enjoyment, and disposal of all his acquisitions."

In the following cases, it is held that the right to use and possess is property: *Missouri Pac. R. Co. v. Nebraska,* 164

U. S. 403, 41 L. Ed. 489, 17 S. Ct. 130; *Dobbins v. Los Angeles*, 195 U. S. 223, 49 L. Ed. 169, 25 S. Ct. 18; *Pennsylvania Coal Co. v. Mahon*, 260 U. S. 393, 67 L. Ed. 322, 43 S. Ct. 158, 28 A. L. R. 1321; *Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U. S. 116, 73 L. Ed. 210, 49 S. Ct. 50, 86 A. L. R. 654; *Commonwealth v. Clearview Coal Co.*, 256 Pa. 328, 100 Atl. 820, L. R. A. 1917E, 672.

The right to sell and dispose of property is a property right. *Buchanan v. Warley*, 245 U. S. 60, 62 L. Ed. 149, 38 S. Ct. 16; *Duplex Printing Press Co. v. Deering*, 254 U. S. 443, 65 L. Ed. 349, 41 S. Ct. 172, 16 A. L. R. 196; *Frost v. Corporation Commission*, 278 U. S. 515, 73 L. Ed. 483, 49 S. Ct. 235.

"The right of the owner to fix a price at which his property shall be sold or used is an inherent attribute of the property itself." *Tyson & Bros. v. Banton*, 273 U. S. 418, 71 L. Ed. 718, 47 S. Ct. 426, 58 A. L. R. 1236.

On the second question, I cite as authority the decision of Honorable Roger J. Meakim, of the superior court of King county, announced in the case of Earle v. Bisazza. In that case, it appears that plaintiff Earle brought an action to recover for rent collected in excess of the amount in a ukase of the OPA. In passing upon the questions presented, Judge Meakim said:

"The Emergency Price Control Act of 1942, Title 50 U.S. C.A. App. Sec. 925 (e) recites:

" 'If any person * * * violates a * * * price schedule prescribing a maximum price * * * , the person who buys such commodity for use or consumption other than in the course of trade or business may bring an action either for $50 or for treble the amount by which the consideration exceeded the applicable maximum price whichever is greater, plus reasonable attorney's fees and costs as determined by the court. For the purposes of this section, the payment or receipt of rent for defense-area housing accommodations shall be deemed the buying or selling of a commodity * * * .'

" 'Any suit or action under this subsection may be brought in any court of competent jurisdiction * * * .'

"The United States Price Administrator adopted a general rent regulation for housing applicable to all housing

accommodations within defense areas, effective June 1, 1942. (7 Fed. Reg.) The Puget Sound area, including the City of Seattle, was designated as a defense rental area by the price administrator on March 2, 1942, (7 Fed. Reg. 1694) and regulation 20, applicable to rents in Seattle, effective June 1, 1942, was adopted on May 27, 1942. (7 Fed. Reg. 4104).

"The Emergency Price Control Act of January 30, 1942, as amended by the Inflation Control Act of October 2, 1942, 50 U.S.C.A. App. Sec. 924(c) creates an Emergency Court of Appeals and (d) provides:

" 'The Emergency Court of Appeals and the Supreme Court upon review of judgments and orders of the Emergency Court of Appeals, shall have exclusive jurisdiction to determine the validity of any regulation or order issued under Section 2 (prices, rents and market and renting practices) * * * and of any provision of any such regulation, order or price schedule. * * * No court, Federal, state or territorial, shall have jurisdiction or power to consider the validity of any such regulation, order or price schedule * * * .'

"It is apparent from the above that in this case, if it is heard in the state court, under the terms of the Federal statute the court will be without 'jurisdiction or power to consider the validity of any such regulation, order or price schedule.'

"JURISDICTION OF THE STATE COURT

"The superior court of Washington is established by Article 4 of our state constitution, and the power and jurisdiction of the superior court are based on Article 4, Sec. 6, and our supreme court has said in the *Cloherty* case, 2 Wash. 137, 27 Pac. 1064:

" 'The State of Washington is a sovereign whose written constitution is her visible charter. By the constitution all the judicial power (which is a distinct branch of the sovereignty) is vested in the courts therein created, independently of all legislation. The jurisdiction of these courts is universal, covering the whole domain of judicial power, even to that growing out of the supposed existence of municipal ordinances.'

"This language was approved in *Blanchard v. Golden Age Brewing Co.*, 188 Wash. 396, at 414, 63 P. (2d) 397, where it is said:

" 'Nor is it any answer to a condemnation of the statute to say that the act, in part, merely prescribes a procedure

to be followed by the courts in such matters. Undoubtedly, the legislature may prescribe reasonable regulations governing court procedure. *Record Pub. Co. v. Monson,* 123 Wash. 569, 213 Pac. 13. As a matter of comity between the separate departments of government, the courts will always recognize reasonable regulations prescribed by the legislature, even though they may seemingly have the appearance of being restrictions. But the courts are not required to recognize a legislative restriction which has the effect of depriving them of a constitutional grant or of one of their inherent powers. What the legislature has not given, it cannot take away. The legislature cannot indirectly control the action of the court by directing what steps must be taken in the progress of a judicial inquiry, for that is a judicial function. *Stephens v. Cherokee Nation,* 174 U. S. 445, 478, 19 S. Ct. 722, 43 L. Ed. 1041; *In re Hagan,* 295 Mo. 435, 245 S. W. 336.'

"See also *Daniel v. Daniel,* 116 Wash. 82.

"Again, and as late as December 10, 1943, our court in *St. Paul, etc. v. Department of Labor and Industries,* 119 Wash. Dec. 682 [19 Wn. (2d) 639], in deciding that in the absence of statute a supersedeas could be granted pending appeal said:

" ' * * * we have, under Sec. 4 of Art. IV of the state constitution, * * * authority to grant a supersedeas * * * and that we may do although the appellant is not, as a matter of right, entitled to a supersedeas under any existing statute. This constitutional power cannot be wholly taken away by statute.'

"That the State of Washington is not alone in adhering to this theory is shown by:

"*Wolton v. Pryor,* 276 Ill. 563, 115 N. E. 2, L. R. A. 1918E 914, Certiorari denied, 60 L. Ed. 961.

"In this case damages were sought in Illinois for the negligent death in Missouri of an employee of a common carrier under the *the* terms of the Federal Employers Liability Act, which provides that:

" 'The jurisdiction of the courts of the United States under this act shall be concurrent with the courts of the several states.'

"The action was brought in the face of an Illinois statute providing:

" 'That no action shall be brought or prosecuted in this state to recover damages for death occurring outside of this state.'

"Sustaining the defendant's demurrer, the court said:

" 'The courts of this state derive their jurisdiction from the constitution and laws of the state and do not derive any power from the laws of the United States, and congress cannot confer jurisdiction upon a state court or any other court which it has not ordained and established.'

"See 14 Am. Jr. Sec. 162, Courts, p. 365.

"In this connection it is to be noted that when the concurrent jurisdiction provided for in the Federal Employers Liability Act was questioned in one of the earlier cases, *Mondon v. N. Y. & H. R. R. R. Co.*, 223 U. S. 1, 56 L. Ed. 327, the court said:

" 'There is not here involved any attempt by Congress to enlarge or regulate the jurisdiction of state courts or to control or affect their modes of procedure * * * .'

"It is apparent from the above authorities, and there are several other cases to the same effect, that the Congress does not control either the power or the jurisdiction of the state courts. 'Jurisdiction' in the state of Washington means the power to hear and determine regardless of whether the ruling made in the particular case be correct or incorrect. *State Ex Rel. McGlothern v. Superior Court*, 112 Wash. 501, 192 Pac. 937. It is likewise apparent that there is a distinction between 'jurisdiction' and 'power.' Given jurisdiction, given the right to hear and determine, a court is not to be directed by a legislature concerning the method of decision; the law is to be applied to the facts established and all relevant facts are to be considered.

"The situation here is that the state court is given a right to hear, not all the facts, but only some of them. Should the defendant challenge the regulation and offer proof otherwise relevant, that proof cannot be admitted. That must certainly amount to a limitation of power and the rule must be that only the source of power can limit it.

"It is to be admitted that there are many cases to be cited where the court follows the limitation in the Federal statute. The great majority, practically all of them, are holdings of the inferior Federal courts. These courts are creatures of Congress with no limit on the right of their creator to limit either their jurisdiction or power; it established it and it may abolish them. They must decide as Congress wills as they have no constitutional source of power. This clearly appears from the March 27th, 1944, opinion in *Yakus v. The U. S.*, 88 L. Ed. Adv. Opinions, p. 653, where it is said in considering this proposition:

" 'This was accomplished by the exercise of the constitutional power of congress to prescribe the jurisdiction of inferior Federal courts, and the jurisdiction of all state courts to determine federal questions, and to vest that jurisdiction in a single court, the emergency court of appeals.'

"This is likewise the effect of the holding in *Bowles v. Willingham*, vol. 88 L. Ed. Adv. Opinions, page 627, decided the same day as the *Yakus* case above.

"In the *Yakus* case a defendant charged by indictment with violation of a regulation was denied the right to prove that the regulation did not conform to the standards of the act and that it violated the fifth amendment.

"Quoting from the opinion:

" 'And we are pointed to no principle of law or provision of the constitution which precludes congress from making criminal the violation of an administrative regulation by one who has failed to avail himself of an adequate separate procedure for the adjudication of its validity, or which precludes the practice, in many ways desirable, of splitting the trial for violations of all administrative regulation by committing the determination of the issue of its validity to the agency which created it, and the issue of violation to a court which is given jurisdiction to punish violations. Such a requirement presents no novel constitutional issue.'

"From the point of view of a defendant, the above is a statement that the trial for the crime is either in two parts in two courts or on only a portion of the issues material to guilt in one court. It might even be said that the idea of 'committing the determination of the issue of its validity to the agency which created it' is, if not 'novel,' at least astonishing.

"True, the instant case is a civil action. It is still a fact, however, that relevant evidence, even in civil cases, is barred by this statute and this is more than control or definition of jurisdiction. It is rather an abridgment of judicial power. It amounts to an order by the legislative branch directing a court to enforce what may be a void statute or regulation and this must be an invasion of the judicial function. Where it appears, as it certainly does in this state, that the courts of Washington are exerting a power from the state's Constitution beyond any right of the legislature to control, it would seem that it is beyond the power of Congress to direct that the state court assume jurisdiction with limited power.

"In the briefs and arguments the claim is made that this is an attempt to use the courts of the state to enforce a penal statute of the United States, and attention is directed to the rule that a penal statute of one jurisdiction will not be enforced in another. The distinction seems to be that a remedial action is one given to the injured party with recovery limited to compensation, while an action in which recovery is permitted for an amount in excess of compensation or indemnity is penal for the reason that the recovery is designed to punish the defendant.

"Our court, in *Bailey v. Hayden*, 65 Wash. 57, 117 Pac. 720, in construing our statute, Rem. Rev. Stat. Sec. 937, which provides that anyone cutting timber on the land of another without authority is liable to the owner in treble damages, said:

" 'It is obvious that the increased measure is allowed, not as compensation to the person wronged, but as punishment to the wrongdoer. It is not a mere question of terms, but of the inherent quality of the thing. The increased measure is punitive in its very nature, in that it exceeds the true measure of compensation.'

"It requires no imagination whatever to determine that a statute which provides that

" ' * * * the person * * * may bring an action either for $50 or for treble the amount by which the consideration exceeded the applicable maximum price, whichever is greater, plus reasonable attorney's fees and costs as determined by the court.'

is punitive in its nature and is designed to punish rather than compensate. At least it is a compulsory payment of an arbitrary sum intended to punish as a deterrent. It may well be penal as far as the defendants are concerned, although it may be remedial as far as the administrator is concerned. For an exhaustive discussion of penal vs. punitive statutes see *Huntington vs. Attrill*, 146 U. S. 657, 36 L. Ed. 1123.

"However, this question here is on demurrer and perhaps the plaintiff may recover his actual loss, if any, although he demands the added penalty. It is not the policy of this state to force a plaintiff out of one door of the courtroom that he may enter another.

"The major problem here is whether our court shall accept jurisdiction when it is offered by Congress with a limitation on power. Is the general power of this court to be limited once it has taken over the case? There is the basic principle

that the judicial branch of government is not to be worn down by the coordinate branches and the rights and duties entrusted by the people through their Constitution to each branch are to be preserved.

"It seems most apparent that the judicial power of the state court is not to be limited by this Federal statute; that the court is entitled or even required to hear all relevant evidence once the inquiry is begun and that in any situation where this is not the fact there is no jurisdiction."

We should follow the rule to which I have just referred. The rule was recently upheld by the supreme court of Rhode Island in the case of *Robinson v. Norato,* 43 A. (2d) (R. I.) 467. That action was brought by a tenant against his landlord for overcharges of rent in violation of the Federal emergency price control act, and of regulations made by the department. The court, in speaking of the portion of the OPA act known as § 205 (e), set out in the majority opinion, stated:

"Is this statute, under the established law of Rhode Island, a penal statute in an international sense? On the authority of the cases here we think that it must be so considered. *McLay v. Slade,* 48 R. I. 357, 138 A. 212; *O'Reilly v. New York & N. E. R. Co.,* 16 R. I. 388, 17 A. 171, 906, 19 A. 244, 5 L. R. A. 364, 6 L. R. A. 719. That the penal statutes of one state will not be enforced by the courts of another state is a rule of private international law, which is universally acknowledged and applied. The Antelope, 10 Wheat. 66, 123, 6 L. Ed. 268; *State of Wisconsin v. Pelican Ins. Co.,* 127 U. S. 265, 8 S. Ct. 1370, 32 L. Ed. 239. But there has long been an apparently irreconcilable divergence of view as to what is a penal statute in an international sense. The settled view of the Supreme Court of the United States appears to be that a statute is penal, in that sense only if 'its purpose is to punish an offense against the public justice of the state' rather than 'to afford a private remedy to a person injured by the wrongful act.' *Huntington v. Attrill,* 146 U. S. 657, 673, 13 S. Ct. 224, 230, 36 L. Ed. 1123.

"Since that decision was handed down in 1892 many state courts have followed it and some, in order to do so, have overruled their own prior decisions, which had enunciated a different rule. *Wellman v. Mead,* 93 Vt. 322, 107 A. 396; *Daury v. Ferraro,* 108 Conn. 386, 143 A. 630, 62 A. L. R. 1323. But in the *McLay* case, *supra,* this court, although it was also

urged to overrule its prior decision in the *O'Reilly* case, expressly declined to do so. In that case this court had held that, where a Massachusetts statute had for its object some punishment of the defendant, it was a penal statute, notwithstanding the fact that the penalty of not less than $500 to be recovered by a civil action inured to the benefit of certain persons designated by the statute and not to the state of Massachusetts. Such was the so-called broad view of a penal statute that was somewhat widely held in this country until the opinion in *Huntington v. Attrill, supra,* gave strong support to what is sometimes called the narrow view. The latter view has been briefly and well expressed by the New York Court of Appeals, speaking through Judge Cardozo, in *Loucks v. Standard Oil Co.*, 224 N. Y. 99, 102, 120 N. E. 198, wherein a penal statute in the international sense is defined as 'one that awards a penalty to the state, or to a public officer in its behalf, or to a member of the public, suing in the interest of the whole community to redress a public wrong. * * * The purpose must be, not reparation to one aggrieved, but vindication of the public justice.'

"On that view it may be that section 205 (e) is not a penal statute, but, in our opinion, there is no question that under the rule of the *O'Reilly* case it is such a statute. In that case this court held to be penal a Massachusetts statute which was less punitive than section 205 (e). The feature of a statute which distinguishes it as penal, in the view of this court, is the imposition of some punishment upon the defendant for the violation of the law, regardless of whether the penalty is recoverable by a private person or not. This distinction was pointed out in *Gardner v. New York & N. E. R. Co.*, 17 R. I. 790, 24 A. 831, 832.

"There a Connecticut statute that somewhat resembled the Massachusetts statute, which was involved in the *O'Reilly* case, in that it provided a remedy for damages to the person injured by its violation, was held to be not penal but remedial, because it provided for no recovery, by either the state or the injured person, of a penalty as punishment to the defendant for violating the statute. The court expressly stated that: 'A penal statute is one by which some punishment is imposed for a violation of the law.' And it pointed out that since, unlike the Massachusetts statute, none was provided for in the Connecticut statute, it was not penal but entirely remedial. The federal statute here not only provides for the recovery of a penalty by the person

injured but also for the recovery of an identical penalty by the United States whenever the injured person is not entitled to bring suit himself. The case at bar is an action, under the statute, to recover the arbitrary sum of $50 for each violation of such statute, regardless of the actual damage suffered by the plaintiff. It, therefore, clearly comes within the rule of the *O'Reilly* case and is not cognizable in the courts of this state.

"Plaintiff practically concedes that this conclusion is correct if the rule of the *O'Reilly* case is adhered to, but he argues that it should no longer be followed, first, because the rule of *Huntington v. Attrill, supra,* was substantially approved in *Kilton, Warren & Co. v. Providence Tool Co.,* 22 R. I. 605, 48 A. 1039; second, because in the *McLay* case this court leaned heavily on certain Massachusetts cases and that state has since adopted the rule of the *Huntington* case, thereby weakening the *McLay* case as authority; and, third, that in any event we should overrule that case and the *O'Reilly* case.

"The answer to the first contention is that it is without foundation. A careful reading of the opinion in the *Kilton, Warren & Co.* case will show that this court was not considering whether the statute there involved was penal in an international sense. The question for decision was solely whether the statute was strictly penal so as to fall under the provisions of a special statute of limitations. In its discussion of the problem before it, the court was careful to say, 22 R. I. at page 613, 48 A. at page 1041, of the opinion: 'That the effect of this statute is to impose a penalty upon the stockholder for the default of the corporation may be admitted.' And then after quoting from the *Huntington* case as to the characteristics of a strictly penal statute, the court took the pains to state expressly: 'It need hardly be said that this construction of chapter 288 is not a decision that the provisions of chapter 555, Pub. Laws 1876, imposing special liabilities upon stockholders and officers of manufacturing corporations, in cases of nonperformance of statutory duties, are not of a penal character.' In other words, while the court held that the statute was not a strictly penal statute within the contemplation of the special statute of limitations, it was nevertheless a penal statute for other purposes.

"The second contention is equally without merit. The context of the opinion in the *McLay* case shows that this court recognized and applied the well-established rule that the test of whether a statute is penal in an international

sense is not what the Legislature or the court of its home state says it is but what the court where it is sought to be enforced says it is. In its discussion of the Massachusetts cases this court, in the *McLay* case, did not say that those cases were controlling on the question whether the Massachusetts statute was to be deemed penal in its nature in Rhode Island."

I call especial notice to the conclusion made by the Rhode Island court:

"The supremacy clause of the federal Constitution cannot, in our opinion, be legitimately construed to compel state courts to take jurisdiction and enforce such penal statutes. On that score such statutes of the several states and the United States stand upon an equal footing. They are to be enforced or not enforced according to the rule of comity in private international law and not by reason of any constitutional mandate. Except as to the full faith and credit clause, the Constitution is silent on this subject. Each state is free to decide what statutes of another jurisdiction are penal and, therefore, unenforceable in its courts, provided, however, that as to the states of the Union and the United States, it may not discriminate in favor of state laws and against the laws of the United States.

"To summarize our position, we hold that, in the consideration of a statute like the one before us, this court has the right and authority to determine its character before allowing it to be enforced in the courts of this state; that if we find it to be penal we may refuse to enforce it regardless of its federal origin; and that the federal Constitution does not require us to treat the United States in a matter of this nature more favorably than we do a sister state of the Union. The contrary view would make the state courts, nolens volens, in effect, inferior federal courts to enforce *all* federal statutes, whenever Congress so declares."

In order to make plain my contention that plaintiff is entitled to prevail upon the merits shown by the evidence, I deem it necessary to recite facts in addition to those mentioned in the majority opinion. In considering this point, I admit for the purpose of argument that the OPA act is constitutional and that the courts of this state have jurisdiction of cases of this nature.

Appellant, Bartley B. Gilman, was a city light electrician, and with his wife had lived in Seattle for forty-five years.

Appellants rented a room April 1, 1941, for forty-five dollars per month. At that time, the room contained a bed and a kitchen table. There were no housekeeping facilities, because the occupants only wanted a place to sleep. In January, 1942, the property was improved in the following manner: The closet was enlarged and in it was installed a double bed; a frame partition was put in and French doors hung, which made an extra room, and drapes and shades were installed; the premises were air-conditioned, and an electric hot water tank and electric washing service were installed; hardwood floors were laid; appellants furnished the rooms with walnut furniture, rugs, and beds, a library table, occasional chairs, a dining set complete, kitchen complete—linen and dishes and cooking utensils, silverware, Frigidaire, electric range; chiffonier and dresser set complete; bedding and pillows were also furnished. Everything was arranged for housekeeping. All that the renters had to do was to buy their provisions.

In addition, a new private entrance was made for respondents. The total cost of all the improvements was $1,585.

Immediately after the change, appellants charged a rental of seventy-five dollars a month for the apartment as furnished.

May 29, 1942, the Federal OPA office issued a decree entitled "How to Determine Your Maximum Rent." The pertinent portion of that document reads as follows:

"The maximum rent for a housing accommodation actually rented on April 1, 1941, is the rent for such accommodation on that date, excepting when the following substantial changes occurred between April 1, 1941 and June 1, 1942:

"(1) When the number of separate dwelling units in a housing accommodation was increased or decreased between those dates, the maximum rent for each separate unit is the first rent charged after such change.

"(2) When the housing accommodation was changed from unfurnished to fully furnished or from fully furnished to unfurnished between those dates, the maximum rent is the first rent charged after such change.

"(3) When the housing accommodation was substantially changed between those dates by a major capital improve-

ment as distinguished from ordinary repair, replacement and maintenance, the maximum rent is the first rent charged after such capital improvement. A major capital improvement refers only to a real change in the character of the housing accommodations, such as additional rooms, a new porch, a new garage, a new bath or toilet. Maintenance, repairs, replacements or minor changes are not major capital improvements, even though they involve large expenditures, such as the cost of a new roof. . . .

"Whenever the maximum rent is fixed other than by the rent actually charged on April 1, 1941, the area rent director may order a decrease in the maximum rent, after giving notice to the landlord. There are also a few exceptional cases in which the landlord may petition for an increase in the maximum rent. However, such an increase can not be effective until such time as the landlord's petition has been granted by the director. It, therefore, cannot affect the rent payable June 1, 1942."

Shortly before July 16, 1942, appellants filed on blanks for that purpose, a registration of their premises. That registration showed the former rental of forty-five dollars. The rents charged, as seventy-five dollars per month, and the maximum legal rent which could be charged, of ninety dollars per month. The registration contained the statement:

"This was converted from a single unit to a double unit consisting of two bedrooms, all linen, dishes, cooking utensels, Bedding, & telephone service.—Rented at Present to two Families of two each."

On the registration blank were two stamps placed there by the OPA. One stated: "VOID Must Be Registered again Return this form with your new registration."

The other read: "Maximum Rent Changed by Order of Rent Director Dated June 15, 1943 to $45.00 per mo. effective June 1, 1942."

After filing their registration, appellants did not hear concerning it until it was returned by mail June 15, 1943, at which time they were told that they could only charge a rental of forty-five dollars per month. It was the duty of the OPA to serve a notice upon appellants when they pro-

posed to change the rent from seventy-five dollars a month to forty-five dollars a month. This is demonstrated by the following excerpt from *Bowles v. Willingham,* 321 U. S. 503, 88 L. Ed. 892, 64 S. Ct. 641:

"By Procedural Regulation No. 3, as amended (8 Fed. Reg. 526, 1798, 3534, 5481, 14811) issued pursuant to § 201 (d) and § 203 (a) of the Act provision was made that when the Rent Director proposed to take such action he should serve a notice upon the landlord involved, stating the proposed action and the grounds therefor."

In that case, the rent dictator gave written notice to Mrs. Willingham that he proposed to decrease rents on apartments which she owned. That requirement was not complied with in this case. Dictatorial government agencies should at least follow their own rules.

In the instant case, appellants converted a bare flat, giving meagre accommodations to one or two people, into a modern, completely equipped, apartment, for the use of four people, in order to assist the war effort by supplying additional living quarters. All they have received in return is a judgment which takes away their hard-earned savings. Their improvements were major improvements which called for more rent. In any event, the recovery should be denied for the reason that the notice of reduction had not been served upon appellants.

The unconscionable acts of the OPA in this case are in keeping with other acts of that arbitrary, dictatorial, and un-American bureau, which, holding forth the bugaboo of inflation, has brought financial ruin to tens of thousands of Americans. As Senator Byrd has said, "It is a new idea, strange to the American way of life and foreign to its origins." Its rent controls have advanced to a point of confiscation and control of property without trial or due process of law. Under the OPA system, a businessman in certain lines has three choices: (1) lose money; (2) violate orders; or (3) go out of business.

As an example: For some reason, OPA fixed the ceiling price of two dollars fifty cents per hundredweight for Loui-

siana potatoes; at the same time, the Texas price was fixed at three dollars seventy-five cents per hundredweight. Louisiana potatoes trucked across the state line brought fifty per cent more than when sold in the accustomed local market. In speaking of this situation, Representative James H. Morrison of Louisiana stated:

"The fault lies solely with OPA. I read in the papers that New York City is without potatoes. Washington is short of potatoes, and yet there are tons and tons of potatoes right there in the ground in Louisiana that may never be dug. Why? Because they have the ridiculous ceiling price of $2.50. Either there is an ulterior motive behind this whole thing or it is based upon gross incompetence."

The OPA caused a loss of one billion dollars in postponing the settlement of the recent steel strike. Employees were entitled to a raise in wages. Employers were willing to grant the increase, but could not do it until the price of their products was raised to a point where they would not have to do business at a loss. OPA delayed to grant the increase until one billion dollars had been lost to the American people, and reconversion unduly delayed. Dairy herds by the thousands have been destroyed by the arbitrary actions of OPA. After an inquiry extending over some ten months, a committee reported to its house of representatives in November, 1943, that it had found in OPA an ominous picture of the early preliminary steps to a dictatorship. This committee also stated:

"Your committee has found, not only that the Office of Price Administration has developed an unauthorized and illegal judicial system but that through the mass of rules and regulations daily enacted has also developed such intricate and involved administrative review machinery that litigants are completely bewildered. . . . This situation must be changed, and changed immediately, if our form of government is to endure."

In an earlier report on rent controls, this committee had said (Report No. 699, 78th, 1st, July 27, 1943):

"By means of its regulations regarding evictions, the Rent Department of OPA has set aside and over-ridden State and local laws in all except three defense-rental areas, and has attempted to 'educate' the courts to do likewise, thereby acting beyond the scope of its authority and invading the constitutional rights of citizens. . . . OPA grants permission to public housing to increase its rentals to the comparable market levels, but denies to private housing this right, even though the rentals in the private housing were kept below the market level as a result of Federal Housing regulations."

It seems strange that OPA can survive. That it does live is due in a large part to its propaganda department manned by hundreds of skilled and well-paid servants who have overcome the spirit of liberty which actuated our forefathers in dumping British tea into Boston Harbor.

OPA is an outlaw. It sears, burns, and destroys all it touches. It is a tyrant and knows no law, save its own caprice.

The problem confronting us is greater than the decision in this case—it involves the existence of a free country. Now America is traveling the road to serfdom, guided and commanded by thousands of boards, bureaus, offices, and commissions. In the forefront, carrying the flag of tyranny, marches the OPA.

In an article entitled "It Can Happen Here" in 1937, George Sokolsky wrote to explain the Russian revolution.

"What were intelligent, educated people doing [before that]?" he asked. "They were having a swell time. Every night the cafes were filled. The artists sang humorous songs about Lenin and Trotsky and the business men applauded with merriment . . . the majority was destroyed because it could not believe that it had to organize and fight to live."

The decision in this case should be that the act is unconstitutional, or in any event, that courts of this state do not have jurisdiction to settle the controversy between these

individuals. If we cannot so decide, we should hold that appellants are entitled to prevail on the merits.

MILLARD, J., concurs with SIMPSON, J.

STEINERT, J. (dissenting)—I dissent upon the three grounds stated in the first paragraph of Judge Simpson's opinion.

September 26, 1946. Petition for rehearing denied.

