[No. 14347. Department Two. January 29, 1918.]

Olivia D. Larson, *Respondent*, v. Robert S. McMillan, *Appellant*.[1]

Limitation of Actions—Fraud—Discovery. An action for deceit in representing that defendant was unmarried when he married plaintiff does not accrue until by investigation she discovered the truth as to his former marriage, although some time before she had discovered a letter telling of his family and other wife, where defendant denied any other marriage and plaintiff had continued to live with him relying thereon; as the false representations were continued by his conduct.

Same. The discovery of the fraud is not shown by common rumor that he was married, where it was not brought home to the plaintiff.

Marriage—Illegal Marriage—Damages—Financial Standing of Husband—Evidence—Admissibility. In an action for deceit in marrying plaintiff while having a wife living, evidence of defendant's financial standing is admissible upon the subject of compensation; and the same is not be be confined to the standing at the date of the discovery of the fraud.

Same. In such action, plaintiff is entitled to show the worth of speculative property within a reasonable time after it is developed, and the jury may fix the compensation as of the time the verdict was rendered.

Appeal—Review—Harmless Error. It is not ground for reversal that the record became confused because respondent was entitled to

[1]Reported in 170 Pac. 324.

make inquiry into all appellant's affairs and put the jury to greater care in sifting the facts.

MARRIAGE—ILLEGAL MARRIAGE—ACTION FOR DAMAGES—DEFENSES. In an action for deceit in marrying plaintiff while defendant had a wife living, it is no defense to recovery for pain and suffering in childbirth that plaintiff was pregnant by defendant at the time of the marriage, or that she procured an abortion of another child.

TRIAL—INSTRUCTIONS—REQUESTS. It is not error to refuse a requested instruction that assumes a debatable question to be a proved fact.

MARRIAGE—ILLEGAL MARRIAGE—DAMAGES—EXCESSIVENESS. A verdict for $35,000 for deceitfully contracting a marriage while having another wife living, reduced by the court to $20,000, will not be held excessive where it is no more than the equivalent of an equitable distribution of defendant's property upon an annulment of a lawful marriage.

Appeal from a judgment of the superior court for King county, Mackintosh, J., entered March 31, 1917, upon the verdict of a jury rendered in favor of the plaintiff, in an action for fraud. Affirmed.

*Griffin & Griffin*, for appellant.

*J. W. Albright*, for respondent.

CHADWICK, J.—This is an action for deceit. The principal question is whether the action is barred by the statute of limitations. To answer compels us to state the facts. This we shall do as briefly as the nature and importance of the case will permit.

Some thirty years ago, appellant married in the province of Prince Edward Island, Canada. At all times hereinafter mentioned his family consisted of the wife, Catharine McMillan, and two sons, John Francis McMillan and William McMillan. At some time, it is not made clear in the record, appellant went to Alaska. That he was in Alaska four years prior to the fall of 1911 may be reasonably inferred from the testimony. He engaged in mining on Engineer creek, Esther creek and other creeks in the vicinity of Iditarod.

Respondent, a single woman, a native of Sweden, came to this country about 1896. She worked as a domestic in Boston and New York; later she went to Alaska, where she engaged in domestic service, and later bought and operated a laundry on Engineer creek. Appellant met respondent in the year 1909. They became friends, and kept company with each other up to the spring or early summer of 1911, when their relations became more intimate than the law allows.

Respondent being pregnant by appellant, they were married on the 11th day of September, 1911, and at once began to live together as husband and wife. When she married, respondent had nearly two thousand dollars in her own right. This seems to have been the ready capital of the twain at the time. Appellant had some mining property which up to that time had yielded no substantial returns. They came out to the states in the fall, November or December, 1911, and went on to Boston for a visit. Appellant desired that respondent should go to Sweden for a visit. This was agreed to.

Appellant went to Prince Edward Island ostensibly to visit his parents; in reality to visit his family. Respondent remained in Boston intending to await the delivery of her child. Respondent wrote appellant at an address which he had given her. Upon receipt of this letter, he directed that she write no more letters, saying he would not remain there as long as he had first intended. He remained, however, with his family until some time late in February. He came back to Seattle, and early in March telegraphed respondent for $125 with which to return north. This she sent to him by telegraphic money order.

Respondent, after being delivered of a stillborn child, went to Sweden, where she visited her people. She returned to Boston in July. She later went to San Francisco, and being without sufficient funds to buy passage to Iditarod, engaged as a domestic for several months. She arrived at Iditarod in the last days of August, 1913. The parties at once resumed their former relations.

In September respondent discovered a letter of date February 13, 1913, written by respondent's son, John Francis McMillan, in which he tells of the family, their dissatisfaction with present conditions, of respondent's visits home, and urging him strongly to either sell or make such disposition of the farm as would permit the family to come west. In the letter the mother is referred to frequently. "Mother wants to go west with us." "Mother does not want to stay at Hunter River alone." From these expressions and her subsequent conduct, it is insisted that respondent "certainly learned that appellant had a wife living, if she did not know it before."

Respondent went in confidence to a Mrs. Riley, the wife of appellant's partner, and left the letter with her for safekeeping. She may have told one or two others. Later she called in a Mr. Rodin, a lawyer, and told him of her discovery and her anxiety. He advised her to put the question squarely up to appellant. This she did. Appellant assured her that he had not been a married man. He explained the letter, saying that he had always intended telling her that, when a young man, he had gotten a young girl in trouble; that he had left her on his farm and had gone his way. Respondent asked "how about the second son?" He assured her that the woman had later married and had a child by her husband, who had since died. Respondent, who seems to have been whipped of two emotions—affection for respondent, who was a "good husband," and doubt of her relation to him—told him that she was not entirely satisfied. She testifies:

"So I said, 'Well, Bob, still it don't really sound right. I am nervous about it, and I am going to tell you one thing, Bob; I will be more fair to you than you have been to me. I am going to find it out. If you want to tell it to me, that is all right, but if you don't tell it to me, I will not rest until I find out, because I am nervous.' And he said, 'Go ahead.' He said, 'Go ahead.' He didn't admit that he was married. He said, 'Go ahead and find out.' "

Accordingly, she asked Mr. Rodin to make due inquiry and let her know the truth.

The parties continued to live together. Respondent became pregnant a second time. They came out for the winter and took apartments in Seattle. On March 10, 1914, Mr. Rodin informed respondent that appellant was in truth a married man. She left him on that day. This action was begun on the 21st day of February, 1916.

Appellant contends that the cause of action accrued in September, 1913, and the parties, both being residents of Alaska at the time, are bound under the laws of Alaska, which we will enforce under Rem. Code, § 178. Counsel for respondent insists that the cause of action did not accrue until the 10th day of March, 1914.

To hold the action barred we must find that the letter hereinbefore referred to was notice, or was sufficient to put respondent upon inquiry which would have revealed the fact as of that time that appellant was a married man. To so hold would violate the plainest principles of justice and humanity and do violence to a settled rule of law. In matters involving ordinary contract relations, a party is put to the burden of making due inquiry when apprised of facts which would lead to the truth. But the respondent is not to be so bound. The letter in itself is not notice of the fact that the "mother" referred to in it was the lawful wife of appellant. But for the fact that appellant had told respondent, and declared to the minister who performed the ceremony, in the presence of a witness to the marriage, that he had never been married, it was not even calculated to arouse suspicion. It is not unusual to divorce a wife, or, less frequently perhaps, to desert the object of a youthful passion, as respondent assured appellant he had done.

That appellant had in truth been a single man seemed most likely. In *Sears v. Wegner*, 150 Mich. 388, 114 N. W. 224, 14 L. R. A. (N. S.) 819, the plaintiff knew that defendant had been married, but she entered into a contract mar-

riage with him upon his assurance that his former marriage was void and offered no obstacle to her marriage with him. He offered to take plaintiff to the woman to whom he said he had been married, in order that plaintiff might ascertain the truth of his statements. Of this conduct, the court said:

"The suspicions of a trusting woman might easily be allayed by this bold offer. In a similar case the plaintiff was informed by the defendant that he was divorced, and offered to take her to his mother to ascertain the truth of his assertion. He was not, in fact, divorced, and the court said that the very boldness and audacity of the offer would naturally disarm her suspicion."

The extreme improbability of a man of mature years contracting a bigamous marriage, when coupled with his assurance that he had never had another wife and had not then a lawful wife other than respondent, and his implied invitation—itself an assurance of good faith—to make her own investigation, is enough to bar appellant of the defense that his fraud ripened into a cause of action at the time the letter was discovered. Appellant did what many a man has done to save his face when confronted by a doubting or angry wife. He lied to her. The law would be a thing to be despised if it were so written that one holding a confidential or fiduciary relation to another could coin a lie into a statute of limitations.

Respondent would not have been warranted in leaving appellant upon the faith of the letter, considering appellant's conduct and his assurances. She was, in her own mind and upon the record as appellant had made it, his lawful wedded wife. She did no more than her duty when she trusted him.

Whatever their relations to others may have been, the principals in this unfortunate affair were not dealing at arm's length. They were conjugate; and their relations *inter sese* were as fiduciary as if the marriage had been a valid one. The trust of a wife is not to be swept away as a thistledown by a breath of suspicion. It is the policy of the law, for the

good of society demands it, that trust and confidence between a husband and wife shall be sustained to the very limit. The fraud of appellant did not ripen in September, 1913. It had a rebirth at that time, but did not ripen into its true self until March 10, 1914. No right of action accrued until appellant had ceased to live his lie. So long as he cohabited with respondent as her husband, he continued to falsely represent, and cannot now be heard to say that respondent is barred because she believed him and in him. *Morrill v. Palmer*, 68 Vt. 1, 33 Atl. 829, 33 L. R. A. 411, is a case very similar to the one at bar. The parties were married in the year 1860. At the time, defendant had a wife living from whom he had not obtained a divorce. He represented himself to be a single man. It was contended that the cause of action accrued at the time the marriage ceremony was performed, or if not at that time, that plaintiff had notice of facts sufficient to put her upon inquiry which if pursued would have led to a discovery of the fraud. The facts relied on were that plaintiff "had visited the defendant's father's family in 1864 and was informed that a little girl then there was the defendant's child; that the defendant's mother told the plaintiff that the defendant had been married before, but that he had been divorced." The court held that "she had a right to presume that the divorce was granted prior to her marriage, for she was told by her husband that her marriage with him was legal." Upon the main question, the court said:

"It is error to assume that the cause of action for these wrongs accrued at the time of the marriage. The representations of the defendant were continuous. He perpetrated a most gross, wilful and deliberate fraud upon the plaintiff, not only by his statements that he had made prior to his marriage, but by the act of marriage itself, and his continuing to live with the plaintiff as her husband for a generation. It was a continuing fraud. He made these fraudulent and deceitful representations at the time the contract was negotiated, at the time the marriage was solemnized and consum-

mated, and he continued by his conduct, to make them daily 'from the rising of the sun until the going down of the same'."

See, also, 25 Cyc. 1193, and 1181; *Hodges v. Hodges*, 27 Tex. Civ. App. 537, 66 S. W. 239; *Sears v. Wegner*, 150 Mich. 388, 114 N. W. 224, 14 L. R. A. (N. S.) 819; *Blossom v. Barrett*, 37 N. Y. 434, 97 Am. Dec. 747.

We are doing violence to no rule or precept in holding appellant to account. There is much authority to the effect that a cause of action resting in fraud accrues at the time the fraud is committed. There is as much, and more modern, authority to the effect that one who has been defrauded may bring an action after the fraud is discovered. To this latter theory the legislature has given its sanction. Rem. Code, § 159, subd. 4.

We may grant that respondent had a cause of action when the marriage ceremony was performed, and that she had a cause of action at the time she discovered the letter from appellant's son, but she was not bound to bring a suit unless she knew, or should have known, of the fraud. The law binds a party to the exercise of no more than "ordinary care" and "reasonable diligence," and the wrongdoer cannot set up a lack of care or diligence when, by his concealments, he has lulled his victim to sleep upon his rights. The law intends that no one shall profit by his own fraud, or that the statute shall be seized upon as a means whereby a fraud is made successful and secure.

We are not unmindful of the fact that appellant introduced several witnesses who testified that, after September, 1913, and up to the time the parties left Alaska in the late fall, it was common rumor that appellant had been a married man and had a wife living in the east. It is not shown that these rumors were brought home to respondent. If they had been, she could have done no more than she did—take her supposed husband's word for it, or start an independent investigation—in the meantime being true to her trust in him and to her duty as a wife. Neither should the law charge re-

spondent with implied notice of a rumor which was manifestly the child of her trust and confidence in the friends to whom she took her load of doubt and sorrow. It is not going beyond the record of all humanity to say that, when a thing received in confidence is whispered to another in like confidence, rumor, leavened with the sometimes mischievous trait of imagination, begins its work, and the man who *may* be a bigamist by the first tongue is a polygamist when the tale is twice repeated.

It is charged that the court·erred in refusing to strike from plaintiff's complaint an allegation to the effect that appellant was possessed of considerable property. Counsel contends that the financial standing of the appellant was not a material issue.

Testimony tending to show financial standing and social position of a defendant is admissible in two classes of cases: (1) In all actions for malicious or wanton torts where exemplary damages may be awarded; and (2) where the case is of such a nature that the wealth of the defendant increases the wrong inflicted.

In the one class, the testimony is received upon the broad proposition that one who has suffered a wanton or malicious injury from another is entitled to exemplary, punitive or vindictive damages. In the other class, the theory of exemplary damages is rejected, but the testimony is received as an evidential fact tending to fix a just compensation for the loss sustained. This court having rejected the doctrine of exemplary damages as unsound (*Spokane Truck & Dray Co. v. Hoefer*, 2 Wash. 45, 25 Pac. 1072, 26 Am. St. 842, 11 L. R. A. 689; *Baer v. Chambers*, 67 Wash. 357, 121 Pac. 843, Ann. Cas. 1913D 559; *Philips v. Thomas*, 70 Wash. 533, 127 Pac. 97, Ann. Cas. 1914B 800, 42 L. R. A. (N. S.) 582), we have only to inquire whether this case falls within the second class.

The text writers and authorities agree with a unanimity of opinion rarely found in the books that, in cases of breach

of promise, seduction, criminal conversation, and the like, evidence of wealth is admissible as tending to show the value of that which the plaintiff would have secured by a consummation or performance of defendant's promise. The reason for receiving the testimony in this class of cases lies in the nature of the action, which is really an action upon contract, though it is tried out and governed by principles more readily applicable to personal torts. Sutherland, Damages (4th ed), § 483.

It would serve no purpose to review the authorities. The principle has been twice recognized by this court, *Heasley v. Nichols*, 38 Wash. 485, 80 Pac. 769; *Fisher v. Kenyon*, 56 Wash. 8, 104 Pac. 1127. So that it is enough to say that such testimony is admissible when the consequence of the wrong is a loss of service, loss of support, loss of property rights, loss of social position, and domestic establishment, whether it be received to show exemplary damages or compensatory damages, or under an exception to the rule denying the right to recover exemplary damages. Whatever the manner of reasoning may be, all the books and all the cases concur as to the result.

The argument of counsel that there is no testimony even tending to show that appellant was a man of social position or maintained a domestic establishment worthy of the name is without weight, for whatever the hardships and privations of men may be, it is a fact, of which we may all take notice, that, with the accumulation of money, people do establish well ordered homes, and do attain a social influence that does not ordinarily attend on poverty. *Johnson v. Smith*, 64 Me. 553; *Bennett v. Hyde*, 6 Conn. 24.

Neither do we find merit in the contention that respondent is to be bound by the financial situation as of the date of the discovery of his fraud. Between the time of the marriage and the discovery of the fraud, respondent was a dutiful wife and should be compensated for her loss as an equivalent to

what would have been her community interest if the marriage had been valid.

The property of appellant was not productive at the time of the marriage, nor was it, as we remember the record, of proved value when respondent left appellant. The character of the property is such that the law classes it as speculative, and respondent was entitled to show its worth within a reasonable time after it was developed.

We are not willing to hold, considering all the facts and circumstances of this case and the speculative character of the property possessed by the defendant, that an action brought within the statute of limitations is unreasonably delayed. The situation is entirely of appellant's making, and it was within the discretion of the jury to fix compensation as of the time the verdict was rendered.

Appellant makes many assignments of error going to the introduction of testimony. After the pretended marriage, appellant, in partnership with one Riley, developed the mining property in which he was interested, took leases on several properties, bought a dredge, and mined with some profit to himself.

It developed upon the examination of Riley—appellant was not called as a witness, nor did he offer himself as such—that much of the property which respondent charged appellant with owning was not in fact owned by him, and that certain other properties that the firm held under options had lapsed or had proved valueless. But we see no error in this. Being entitled to prove the property interests of appellant, respondent could do so by making inquiry into all of his affairs. Because, in so doing, the record became confused and put the jury to greater care in sifting the facts is no ground for reversal. Especially so, when the jury was aided by the testimony of appellant's banker at Iditarod which shows that appellant is a man of affairs having substantial credit.

Appellant further contends that the court erred in instructing the jury that the discovery of the letter would not of

itself constitute knowledge of the fact of appellant's status as a married man. We have already said enough to indicate that we find no merit in this assignment.

It is also contended that the court erred in instructing the jury:

"If it believed from the evidence that the pretended marriage was fraudulent, and that the plaintiff did not discover it until some time in March, 1914, then it would not be barred by the statute of limitations."

Our discussion of the statute of limitations covers this assignment.

Error is also predicated upon the refusal of the court to give certain instructions requested by appellant. The requested instructions were drawn on the theory of appellant and were properly rejected.

There are other questions occurring in the case, but they are controlled by what we have held upon the main issue and need not be mentioned, excepting only the charge that respondent should not be entitled to recover for the pain and suffering of childbirth because she was pregnant at the time of her pretended marriage, and because she procured an abortion of the second child.

But it seems to us that appellant is in no position to urge these things as a defense. His responsibility for the woman's condition is admitted. Her first indiscretion was cured as to him when he married her, even though the marriage was an illegal one. Her second pregnancy he admits to have come out of his relations with respondent. Had the child been suffered to be born in the natural course, he would have been held to a recompense of her suffering. Being responsible for her condition, and his responsibility resting in crime, we are not disposed to hear his appeal that the folly of the woman exonerates him from the consequences of his wrong.

Appellant contends that respondent compromised and settled her claim for damages, in the spring of 1914, for the sum of $6,000, $3,000 of which has been paid. Appellant was

not a witness, and the case in this respect rests entirely upon the testimony of respondent. A settlement was not pleaded as a defense. Respondent's testimony will hardly bear out appellant's theory. If such an agreement was made it was never performed. The question comes into the case upon a requested instruction as follows:

"In this case the plaintiff has testified that a settlement was agreed upon between her and the defendant whereby the defendant agreed to pay her six thousand dollars in full settlement of her claim set forth in her complaint. She has further testified that the defendant did pay her three thousand dollars, three hundred of which, however, was her own money due from the sale of a cabin owned by her."

We do not so read the record. Not only does respondent not testify that a settlement was made, but she denies that any settlement was made. She testifies that all moneys paid to her were paid for other considerations without reference to a probable claim for damages.

If appellant had been willing to treat the question of settlement as a debatable question, it might have been proper for the court to give an instruction predicated upon the issue and ask the verdict of the jury upon it. Having treated the alleged compromise as a proved fact, he is not in a position to complain.

It is urged that the verdict is excessive. Respondent asked damages in the sum of $50,000; the jury returned a verdict of $35,000, which was reduced by the trial court to the sum of $20,000. The verdict is substantial, but we are not prepared to say, considering all the facts and circumstances of the case, that the amount fixed by the trial court is disproportionate to the wrong committed, or that it is so large as to reflect passion and prejudice. If the marriage had been void for reasons other than the existence of a lawful wife and respondent had brought suit to annul the marriage, she would have been entitled to an equitable distribution of property rights. *Buckley v. Buckley*, 50 Wash. 213, 96 Pac. 1079,

126 Am. St. 900; *In re Brenchley's Estate*, 96 Wash. 223, 164 Pac. 913, L. R. A. 1917E 968.

Having contented herself with an action for damages, we can see no reason why the principles announced in those cases should not apply; especially so where it is fairly certain that the recovery does not exceed what a court of equity would probably grant as a money judgment upon the like state of affairs.

We find no error, and affirm the judgment.

ELLIS, C. J., MOUNT, MORRIS, and HOLCOMB, JJ., concur.