[No. 47594–6.   En Banc.   October 29, 1981.]

ARCHER W. KAMMERER, SR., ET AL, *Respondents,* v.
WESTERN GEAR CORPORATION, *Petitioner.*

*Donald L. Logerwell, Richard W. Seed,* and *Seed, Berry, Vernon & Baynham,* for petitioner.

*James R. Uhlir* and *Graybeal & Uhlir,* for respondents.

DOLLIVER, J.—Defendant Western Gear, a Washington corporation, manufactures offshore oil drilling rigs. In May 1972, after negotiations in California, Western Gear entered into a licensing agreement with plaintiffs Archer W. Kammerer, Sr., Archer W. Kammerer, Jr., and Jean K. Lamphere to manufacture certain oil drilling equipment called heave compensators covered by five Kammerer patents. Plaintiffs are all residents of California.

Heave compensators are used in offshore drilling to counteract the effect of wave action. Western Gear made an initial payment and was to pay a $10,000 royalty for each heave compensator sold.

During the next 3 years, Western Gear sold a number of heave compensators but made no further payments to the Kammerers. In 1975, Western Gear attempted to purchase the Kammerer patents without first informing the Kammerers of the amount of royalties already owed. The Kammerers, upon learning Western Gear had already made and sold a number of heave compensators, demanded the royalties then due be paid. Western Gear refused, whereupon the Kammerers terminated the licensing agreement and sued Western Gear for breach of the patent licensing agreement, seeking both compensatory and punitive damages. The complaint was subsequently amended to allege fraud as well as breach of the license agreement.

During pretrial discovery, the plaintiffs moved under CR 37 to compel discovery of a number of documents previously withheld by Western Gear on grounds of attorney-client privilege. Western Gear agreed to an in camera inspection by the court of the documents requested. At that time Western Gear also conceded that it might have to call its attorneys as witnesses to events occurring during nego-

tiations. The parties stipulated that the motion to compel production of documents should be decided on the basis that Western Gear would call its attorneys. Following its in camera review of the documents, the trial court allowed discovery of all of the documents requested because of the possibility that one of the attorneys involved might be called as a witness. The ruling was for discovery purposes only, and did not constitute a ruling on the claim of privilege or the admissibility of the documents at the time of trial.

At trial, Western Gear decided not to call its attorneys. Documents discovered by the Kammerers were introduced over Western Gear's objection that the documents were privileged. The case was tried to a jury which found that the compensators sold were covered by the Kammerer patents and awarded plaintiffs contract damages of $137,460. The jury also found that Western Gear fraudulently induced the Kammerers to enter into the agreement without intending to perform, and awarded the Kammerers *compensatory* damages in the amount of $250,000 and *punitive* damages of $350,000. The trial judge refused to enter both the $250,000 compensatory damages award and the $137,460 award for contract damages because he considered these awards to be duplicative. Judgment was entered based upon the award for fraud and punitive damages in the amount of $600,000. Both parties appealed. The Court of Appeals affirmed the judgment. *Kammerer v. Western Gear Corp.*, 27 Wn. App. 512, 618 P.2d 1330 (1980). Western Gear petitioned for review which was accepted.

The first issue is whether defendant waived its attorney–client privilege in a pretrial stipulation, thus allowing the discovery of privileged documents. The stipulation states, in relevant part:

Plaintiffs' pending motions for production of documents involving questions of privilege and for terms will be decided by the Court subsequent to hearing on August 28, 1978, and will be decided by the Court on the basis

that Richard W. Seed and James S. Somberg will be witnesses for Western Gear at the time of trial. It is understood, however, that defendant is not required to call them as witnesses at trial.

Upon reviewing the stipulation, the trial court ruled the documents were discoverable including those later to be found privileged. The Court of Appeals agreed.

RCW 5.60.060(2) states that an attorney shall not be examined as to any communications or advice by him to his client without consent of the client. CR 26(b)(1) provides that "Parties may obtain discovery regarding any matter, not privileged, which is relevant . . .". However, offering an attorney's testimony concerning matters learned in the course of his employment waives the attorney–client privilege. 8 J. Wigmore, *Evidence* § 2327, at 637–38 (rev. ed. 1961), cited in *State v. Vandenberg,* 19 Wn. App. 182, 575 P.2d 254 (1978); *Martin v. Shaen,* 22 Wn.2d 505, 156 P.2d 681 (1945). Furthermore, such a waiver cannot be delayed until the trial itself. *Phipps v. Sasser,* 74 Wn.2d 439, 445 P.2d 624 (1968).

Defendant argues that the stipulation was specifically limited to testimony on nonprivileged matters, and that the trial court was advised of this. However, this came subsequent to the ruling of the trial court on this matter. We agree with the Court of Appeals:

> The trial judge offered to deny the motion if Western Gear agreed not to call its attorneys. Western Gear would not do so. We conclude that Western Gear's intent to call its attorneys was sufficiently definite to constitute a waiver of attorney–client privilege.

*Kammerer v. Western Gear Corp.,* 27 Wn. App. 512, 517, 618 P.2d 1330 (1980).

The second issue is whether privileged documents were admitted erroneously. Defendant contends two exhibits were admitted despite the fact they were conceded to be memoranda of a privileged meeting between representatives of Western Gear and its attorneys. One, exhibit 83, which does contain a statement by one of defendant's

attorneys, was offered in evidence by Western Gear. It cannot now claim error. *Sullins v. Sullins,* 65 Wn.2d 283, 396 P.2d 886 (1964).

RCW 5.60.060(2) provides that the attorney–client privilege applies to communications and advice between attorney and client. The privilege extends to written communications from an attorney to his client. *Victor v. Fanning Starkey Co.,* 4 Wn. App. 920, 486 P.2d 323 (1971).

The document in question here, exhibit 82, shows neither a communication from or advice by attorneys to Western Gear. It was prepared by a lay person, not a lawyer. As noted by the Court of Appeals, on its face it is nothing more than a memorandum between corporate employees transmitting business advice rather than a privileged communication between attorney and client.

Defendant's contention that *Upjohn Co. v. United States,* 449 U.S. 383, 66 L. Ed. 2d 584, 101 S. Ct. 677 (1981), applies to this case is not well taken. In *Upjohn,* the documents involved were communications from the corporation's counsel to corporation employees. That was not the situation here. It was not error to admit the exhibits.

The third issue is whether the trial court was required to apply the law of California to defendant's claim for punitive damages. Under the law of this state, punitive damages are not allowed unless expressly authorized by the legislature. *Barr v. Interbay Citizens Bank,* 96 Wn.2d 692 (1981); *Steele v. Johnson,* 76 Wn.2d 750, 458 P.2d 889 (1969); *Maki v. Aluminum Bldg. Prods.,* 73 Wn.2d 23, 436 P.2d 186 (1968); *Conrad v. Lakewood Gen. Hosp.,* 67 Wn.2d 934, 410 P.2d 785, 10 A.L.R.3d 1 (1966). Under the law of California, however, punitive damages may be awarded. Cal. Civ. Code, Exemplary Damages § 3294 (West).

In *Barr v. Interbay Citizens Bank, supra,* we held that the interest of Florida, which allows punitive damages, was subordinate to the interest of Washington which does not allow punitive damages unless expressly authorized by the legislature. As we noted in *Barr* at page 699, "The

interest in Florida in providing an example for deterrence would not be furthered when the actual conduct and the acts which might warrant punitive damages were restricted to Nevada and Washington." (We held in *Barr* that the law in Nevada as to punitive damages was presumed to be the same as Washington.) The case before us is completely different. As the Court of Appeals stated:

[B]oth states have significant contacts with this controversy. Washington is the forum state. Western Gear is a Washington corporation and it manufactures its heave compensators at Everett, Washington, although a substantial part of its manufacturing capacity is in California. Western Gear representatives signed the license agreement in Washington, 1 day after the Kammerers signed in California. California was the site of all negotiations between the parties and the place where any fraudulent representations were made to the Kammerers. The Kammerers are residents of California. Payments of royalties were to be made in California and the initial $20,000 payment was made there. The parties also provided by their agreement that California law should govern their rights under the contract.

California has an obvious interest in the protection of its citizens against fraud, which is enhanced when the negotiations on which the fraud claim is based occurred in California. California has an interest in deterring fraudulent activities by corporations having a substantial business presence within its borders. Washington has no interest in protecting persons who commit fraud. Western Gear asserts that differences in Washington and California law governing fraud suggest that Washington has a policy of greater caution in allowing judgments for fraud. Because we do not find any difference, material to this case, in the laws of the two states, we do not find any interest served by application of Washington law. Because Washington has no interests superior to or inconsistent with the interests of California in this controversy, application of the Restatement rule dictates that California law govern the Kammerers' claim for fraud.

*Kammerer v. Western Gear Corp.*, 27 Wn. App. 512, 520–21, 618 P.2d 1330 (1980).

Defendant chose to go to California to negotiate its contract; the fraudulent representations were made in California; the parties agreed California law would apply. Where the most significant relationships were in California and where the conduct and acts as to the fraud and misrepresentation were accomplished in California that state has a specific interest to be furthered. We hold under these circumstances that a Washington court can award punitive damages under the law of California.

This result is in accord with *O'Brien v. Shearson Hayden Stone, Inc.,* 90 Wn.2d 680, 586 P.2d 830 (1978), *aff'd on rehearing,* 93 Wn.2d 51, 605 P.2d 779 (1980). There we held the Washington usury law should not govern the rights of Washington residents all of whose "dealings, negotiations, and payments were conducted through defendant's Los Angeles office." *O'Brien,* at 688.

Defendant asserts *O'Brien* has, in effect, been overruled by *Whitaker v. Spiegel, Inc.,* 95 Wn.2d 408, 623 P.2d 1147 (1981). The scope of this opinion, however, was narrowed by an amendment made subsequent to the briefing in this case. The opinion originally stated:

Rather, the legislature has directed that, in an action brought in Washington on an allegedly usurious transaction, Washington's usury law will apply, even if the loan was made outside Washington to a Washington resident.

*Whitaker,* at 414. The new language is:

Rather, the legislature has directed that, in an action brought in Washington on an allegedly usurious transaction, Washington's usury law will apply if the debtor was a resident of Washington at the time the loan was made, even if the loan was made outside the state.

Order Amending Opinion Upon Motion for Reconsideration, June 4, 1981; *Whitaker v. Spiegel, Inc.,* 95 Wn.2d 661, 667–68, 623 P.2d 1147, 637 P.2d 235 (1981).

The distinction between *Whitaker* and this case is apparent: In *Whitaker,* the injured party was a resident of Washington. Here the plaintiffs were at all times residents of California. *O'Brien* has not been overruled and is con-

trolling. Plaintiffs are entitled to punitive damages.

The fourth issue to be considered is whether Western Gear was estopped from offering evidence of patent invalidity.

This issue is fully covered in the opinion of the Court of Appeals and need not be restated here. In its petition for review, defendant calls our attention to *Consolidated Kinetics Corp. v. Marshall, Neil & Pauley, Inc.,* 11 Wn. App. 173, 521 P.2d 1209 (1974). This case followed the decision of the United States Supreme Court in *Lear, Inc. v. Adkins,* 395 U.S. 653, 23 L. Ed. 2d 610, 89 S. Ct. 1902 (1969), that "in an action in a state court to recover patent royalties required to be paid pursuant to contract, the state court has jurisdiction to consider the issue of patent validity as a defense to the action." *Consolidated Kinetics,* at 177. It did not, however, change the rule that a licensee cannot be relieved of its obligation to pay royalties until after it affirmatively challenges patent validity. *See PPG Indus., Inc. v. Westwood Chem., Inc.,* 530 F.2d 700 (6th Cir. 1976); *Kraly v. National Distillers & Chem. Corp.,* 502 F.2d 1366 (7th Cir. 1974). Defendant did not challenge patent validity of the license agreement during the life of the agreement. The Court of Appeals was correct in refusing to allow Western Gear to defend against plaintiffs' claim for royalties by asserting patent invalidity.

The Court of Appeals is affirmed.

ROSELLINI, UTTER, WILLIAMS, and DIMMICK, JJ., and COCHRAN and HAMILTON, JJ. Pro Tem., concur.

STAFFORD, J. (dissenting)—Ever since statehood the Washington courts and the legislature have consistently and universally rejected the concept of general unlimited punitive damages. Absent a statutory directive punitive damages have not been available. I therefore must dissent from the majority's unnecessary inroad into this well established and previously consistent rule.

I agree with the abstract concept that under the "most

significant contacts" theory California law should govern this transaction. Nevertheless, the normal "choice of law" result must be overridden by strong public policy in this, the forum state.

There is no constitutional compulsion for the courts of this state to apply the law of another state. The full faith and credit clause only requires that we recognize and give effect to foreign *judgments,* not foreign *laws,* if they contradict a strong public policy. *Hughes v. Fetter,* 341 U.S. 609, 611, 95 L. Ed. 1212, 71 S. Ct. 980 (1951); *cf. Miller v. Kingsley,* 194 Neb. 123, 230 N.W.2d 472 (1969) (must enforce foreign judgment containing punitive damages, but apparently would not have granted punitive damages if original action had been brought in that state). It is the doctrine of comity which persuades us to import another state's laws and rules or decisions. Yet, as stated in *Mirgon v. Sherk,* 196 Wash. 690, 693, 84 P.2d 362 (1938) (overriding foreign law concerning usury):

> A doctrine of comity, however, does not require that any sister state shall enforce contracts to be performed in another which are so contrary to the laws of the state in which they are sought to be enforced as to work a serious interference with its own policy or laws.
>
> "The doctrine of comity must yield to the positive law of the land. Hence, the foreign law must give way when in conflict with the statutes of the forum or the settled current of its judicial decisions.
>
> "Foreign laws will not be given effect when to do so would be contrary to the settled public policy of the forum. . . ." 12 C. J. 438, §§ 14 and 15.

*See also Carstens Packing Co. v. Southern Pac. Co.,* 58 Wash. 239, 108 P. 613 (1910), for further elaboration regarding this court's view on comity.

Courts not only have the power to refuse to apply foreign laws in cases such as this, they have a right to do so. As the Restatement (Second) of Conflict of Laws § 171, comment *d,* p. 513 (1971) points out in discussing which *law* applies regarding damages,

The law governing the right to exemplary damages *need*

*not* necessarily be the same as the law governing the measure of compensatory damages. This is because situations may arise where one state has the dominant interest with respect to the issue of compensatory damages and another state has the dominant interest with respect to the issue of exemplary damages.

(Italics mine.) C. McCormick, *Law of Damages* § 2 (1935) concurs; *see also* 2 J. Beale, *Conflict of Laws,* at 1339–40 (1935):

In a state however where exemplary damages are not allowed, such damages cannot be included, whatever the law of the place of injury, for they would be regarded as penal.

*Accord*, Restatement of Conflict of Laws § 421, comment *a*. R. Leflar, *American Conflicts Law* § 126, at 252 (1977), explains this as follows:

One situation in which the forum's damages rule might properly be applied should be noted. Strong local public policy permits a state to refuse altogether to try a valid foreign cause of action and for the same reason could induce a state never to permit recoveries beyond a certain amount on certain types of causes of action which it is nevertheless willing to entertain. This is a strong public policy that would not often exist in modern times, but it still could exist, and a state having the policy could effectuate it in this fashion.

(Footnotes omitted.)

In dealing with other conflicts of law we have recognized that our state's public policy can override normal "choice of law" results. For example, in the recent case of *Whitaker v. Spiegel, Inc.,* 95 Wn.2d 661, 623 P.2d 1147, 637 P.2d 235 (1981), we held that, regardless of the choice of law analysis, the Washington usury law will apply if the debtor was a resident of Washington at the time the loan was made. *Id.* at 667–68. Similarly, in the early case of *Carstens Packing Co. v. Southern Pac. Co., supra,* we held that a contractual exemption from liability for negligence by a railroad was void as against public policy in this state although valid under the laws of the state where the contract was made. Comity was not deemed to require enforcement by this

state's courts. *See also Mirgon v. Sherk, supra* (overriding Oregon usury law); *Farley v. Fair,* 144 Wash. 101, 256 P. 1031 (1927) (refusing to enforce contract for real estate commission valid in Oregon but not Washington); *cf. Hatcher v. Idaho Gold & Ruby Mining Co.,* 106 Wash. 108, 179 P. 106 (1919) (state statute did not express a public policy to be applied to extraterritorial transactions).

Many of our sister states have also recognized that choice of law rules need not override the basic policies of the forum state regarding punitive damages. *See, e.g., Smyth Sales, Inc. v. Petroleum Heat & Power Co.,* 128 F.2d 697 (3d Cir. 1942) (recognized, at page 702, "in some instances the forum may not allow exemplary damages even though allowed by the law of the state where the wrong occurred . . ."); *Armbruster v. Chicago, R.I. & Pac. Ry.,* 166 Iowa 155, 147 N.W. 337 (1914) (exemplary damages statute penal and not enforced); *Higgins v. Central New Eng. & W. R.R.,* 155 Mass. 176, 29 N.E. 534 (1892) (setting out general rules); *James v. Powell,* 19 N.Y.2d 249, 225 N.E.2d 741, 279 N.Y.S.2d 10 (1967); *Mohr v. Sands,* 44 Okla. 330, 133 P. 238 (1913) (treble damages penal, thus could not be enforced extraterritorially).[1]

Thus, we have both the power and the duty to refuse the importation of foreign laws which are inimical to the strong public policy of this state.

Whether general, unlimited punitive damages, such as those attempted herein are against the strong public policy of this state, is beyond question. An unbroken line of cases, set forth in the margin,[2] and the history of unsuccessful

---

[1]Few recent cases have employed a "public policy" analysis to conflict of law decisions. This is not because public policy has become any *less* significant, however. Rather, many states (such as California) use "interest analysis" to determine choice of law, or use a "better law" analysis. Both methods are based almost entirely upon policy considerations, however.

[2]*State v. Herrmann,* 89 Wn.2d 349, 572 P.2d 713 (1977); *Stanard v. Bolin,* 88 Wn.2d 614, 565 P.2d 94 (1977); *Steele v. Johnson,* 76 Wn.2d 750, 458 P.2d 889 (1969); *Maki v. Aluminum Bldg. Prods.,* 73 Wn.2d 23, 436 P.2d 186 (1968); *Conrad v. Lakewood Gen. Hosp.,* 67 Wn.2d 934, 410 P.2d 785, 10 A.L.R.3d 1 (1966);

428

legislative attempts to enact punitive damages,[3] make it clear that in this state the doctrine of punitive damages is

*Baldwin v. Alberti,* 58 Wn.2d 243, 362 P.2d 258 (1961); *Farrar v. Tribune Publishing Co.,* 57 Wn.2d 549, 358 P.2d 792 (1961); *Browning v. Slenderella Sys.,* 54 Wn.2d 440, 341 P.2d 859 (1959); *Rose v. Galbraith Motor Co.,* 51 Wn.2d 31, 314 P.2d 924 (1957); *Grays Harbor County v. Bay City Lumber Co.,* 47 Wn.2d 879, 289 P.2d 975 (1955); *Anderson v. Dalton,* 40 Wn.2d 894, 246 P.2d 853, 35 A.L.R.2d 302 (1952); *Olwell v. Nye & Nissen Co.,* 26 Wn.2d 282, 173 P.2d 652, 169 A.L.R. 139 (1946); *Walker v. Gilman,* 25 Wn.2d 557, 171 P.2d 797 (1946); *Hickman v. Desimone,* 188 Wash. 499, 62 P.2d 1338 (1936); *Clason v. Velguth,* 168 Wash. 242, 11 P.2d 249 (1932); *Ulvestad v. Dolphin,* 158 Wash. 629, 292 P. 106 (1930); *Wood v. Miller,* 147 Wash. 251, 265 P. 727 (1928); *Melcher v. Clark,* 145 Wash. 95, 258 P. 1032, 54 A.L.R. 448 (1927); *Skidmore v. Seattle,* 138 Wash. 340, 244 P. 545 (1926); *Robertson v. Waterman,* 123 Wash. 508, 212 P. 1074 (1923); *Larson v. McMillan,* 99 Wash. 626, 170 P. 324 (1918); *Bronson v. Syverson,* 88 Wash. 264, 152 P. 1039 (1915); *Wilson v. Sun Publishing Co.,* 85 Wash. 503, 148 P. 774 (1915); *Corcoran v. Postal Tel.-Cable Co.,* 80 Wash. 570, 142 P. 29 (1914); *Nordgren v. Lawrence,* 74 Wash. 305, 133 P. 436 (1913); *Phillips v. Thomas,* 70 Wash. 533, 127 P. 97 (1912); *Woldson v. Larson,* 164 F. 548 (9th Cir. 1908); *McGill v. W.P. Fuller & Co.,* 45 Wash. 615, 88 P. 1038 (1907); *Woodhouse v. Powles,* 43 Wash. 617, 86 P. 1063 (1906); *Ott v. Press Publishing Co.,* 40 Wash. 308, 82 P. 403 (1905); *Levy v. Fleischner, Mayer & Co.,* 12 Wash. 15, 40 P. 384 (1895); *Atrops v. Costello,* 8 Wash. 149, 35 P. 620 (1894); *Sloan v. Langert,* 6 Wash. 26, 32 P. 1015 (1893); *Seattle Crockery Co. v. Haley,* 6 Wash. 302, 33 P. 650 (1893); *Willson v. Northern Pac. R.R.,* 5 Wash. 621, 32 P. 468, 34 P. 146 (1893); *Hannan v. Gross,* 5 Wash. 703, 32 P. 787 (1893); and *Spokane Truck & Dray Co. v. Hoefer,* 2 Wash. 45, 25 P. 1072 (1891).

[3]The many attempts to legislatively authorize punitive damages have been notably unsuccessful. In 1961 a law entitled "Civil Actions—Exemplary Damages for Intentional Injury to Person or Character" was signed into law. Laws of 1961, ch. 97, p. 1583. Nineteen days later repealing legislation was signed by the Governor. Laws of 1961, 1st Ex. Sess., ch. 27, § 6, p. 2722. That same act directed the appointment of a committee on the law of damages. A majority of this committee recommended that it was "not necessary or desirable that legislation be enacted on this subject." Report of the Committee on the Law of Damages to the Washington State Legislature, 38th Session (Feb. 1963). The minority of the committee recommended adoption of the California punitive damage statute, the very statute which the trial court relied upon here. The minority's recommendation was rejected by the legislature. Other more recent efforts have met the same result. *See, e.g.,* Senate Bill 2400, 44th Legislature (Feb. 5, 1975), which sought a legislative declaration that "exemplary or punitive damages are not against the public policy of this state . . ."

Other than a law which expressly prohibits punitive damages I do not see how the legislature could have stated its intent more clearly. In light of this court's heretofore unbroken line of cases expressly holding that nonstatutory punitive damages are against the public policy of this state, I do not think the legislature

deemed "unsound in principle, and unfair and dangerous in practice". *Spokane Truck & Dray Co. v. Hoefer,* 2 Wash. 45, 56, 25 P. 1072 (1891).

The concerns expressed in *Spokane Truck* and its progeny have not lost their vitality in the last 90 years, yet the debate still persists. *Compare* Ghiardi, *The Case Against Punitive Damages,* 8 Forum 411 (1972) (hereinafter Ghiardi), *with* Comment, *Exemplary Damages—Why Not in Washington?,* 12 Gonz. L. Rev. 635 (1977) (hereinafter Comment, 12 Gonz. L. Rev.). Over the intervening years little new has been added and *Spokane Truck* remains persuasive. There is no justification for general, unlimited punitive damages which withstands analysis, and there are many unsolved problems with their practical application. Unless the rule in *Spokane Truck* is clearly wrong, that well reasoned and well researched opinion should stand. Most certainly it should not be gutted *sub silentio.*

Some say punitive damages are proper in order to provide full compensation for a plaintiff, especially for such things as hurt feelings and attorneys fees. As to the former, however, compensatory damages now cover virtually all injury imposed upon the plaintiff, even that bordering on the imaginary and speculative. As stated in *Spokane Truck,* at 52–53:

> There is nothing stinted in the rule of compensation. The party is fully compensated for all the injury done his person or his property, and for all losses which he may sustain by reason of the injury, in addition to recompense for physical pain, if any has been inflicted. But it does not stop here; it enters the domain of feeling, tenderly inquires into his mental sufferings, and pays him for any anguish of mind that he may have experienced. Indignities received, insults borne, sense of shame or humiliation endured, lacerations of feelings, disfiguration, loss of reputation or social position, loss of honor, impairment of credit, and every actual loss, and some which frequently border on the imaginary, are paid for under the rule of compensatory damages. The plaintiff is made entirely

should be required to further state its apparent intent on this matter.

whole. The bond has been paid in full. Surely the public can have no interest in exacting the pound of flesh.

Since then, the possibility for recovering damages has even been broadened in Washington. For example, in *Grimsby v. Samson,* 85 Wn.2d 52, 530 P.2d 291 (1975), we held a plaintiff could recover for severe emotional distress, even absent physical injury, when there was intentional or reckless conduct which was "outrageous and extreme." *See also Corrigal v. Ball & Dodd Funeral Home, Inc.,* 89 Wn.2d 959, 577 P.2d 580 (1978). Given such wide latitude in the area of compensatory damages, juries are allowed to award what they regard as full compensation. *See* Comment, 12 Gonz. L. Rev., at 644–45.

As to the second purported deficiency in compensation, there are certainly more direct, certain and logical methods of allowing the recovery of litigation expenses, if it should be determined there should be reimbursement. As stated in Ghiardi, at 417:

> Assuming, arguendo, that present procedural rules are incomplete in not providing for litigation expenses, the logical remedy would be to amend and improve the rules of procedure, not tamper with the compensatory function of tort damages. Procedural reform is the proper remedy rather than allowing the virtually unchecked caprice of juries to provide some relief. In addition, procedural reform would apply to all civil litigation.

Some say that punitive damages are necessary to provide a deterrence against socially unacceptable behavior. This argument is fallacious for a number of reasons.

First, it is debatable that punitive damages might have a deterrent effect. Even in the face of the awesome power of the criminal justice system, crime increases at a horrendous pace. If criminal sanctions cannot prevent socially unacceptable behavior, how can punitive damages? This is particularly true when it is considered that few people have any knowledge or understanding of punitive damages, although they are quite aware of criminal sanctions against acts for which they could also be held liable in punitive

damages. *See* Ghiardi, at 418. The lack of a deterrent effect was the major reason why the Tennessee Supreme Court decided punitive damages could be insured against in *Lazenby v. Universal Underwriters Ins. Co.,* 214 Tenn. 639, 383 S.W.2d 1 (1964).

I have not noticed any higher incident of oppression, fraud or malice in our state, which does not allow punitive damages, than in California which allows punitive damages. To my knowledge, there has not been any empirical support for the deterrent effect of punitive damages. It is speculative at best. K. Redden, *Punitive Damages* 628 (1980) (hereinafter Redden).

Second, the possibility of having to pay full compensatory damages acts as a sufficient deterrent in most cases, if one is needed. Compensatory damages impose a tangible pecuniary burden on a tort–feasor. The knowledge that such a burden can be imposed can serve to deter a tort–feasor from such conduct. This is particularly true when courts and juries tend to be liberal in their awards of compensatory damages. For example, the complaint in this case sought $85,000 compensatory damages. Nevertheless, the jury awarded $137,460 compensatory damages on one theory plus $250,000 compensatory damages on another. Clearly it felt this would not be an adequate deterrent because it added another $350,000 punitive damages! For other recent examples of compensatory damages sufficient to act as a deterrent, *see Lundgren v. Whitney's, Inc.,* 94 Wn.2d 91, 614 P.2d 1272 (1980); *Cherberg v. Peoples Nat'l Bank,* 88 Wn.2d 595, 564 P.2d 1137 (1977); *Freeman v. Intalco Aluminum Corp.,* 15 Wn. App. 677, 552 P.2d 214 (1976).

Third, the best deterrence is one that is foreseeable and certain. The inconsistency of punitive damages, however, granted or denied basically on the whim of the jury, inherently lacks the certainty necessary for adequate deterrence. As observed in Long, *Punitive Damages: An Unsettled Doctrine,* 25 Drake L. Rev. 870, 881 (1976) (hereinafter Long), after evaluating guidelines for punitive damages

among several states:

> Perhaps a fourth observation is permissible: that virtually any punitive damages guidelines can be construed to fit the pleasure of the judges and the juries called upon to administer the justice. If so, the conclusion follows that the conduct deemed sufficiently antisocial to warrant punitive damages cannot necessarily be identified in advance of a punitive award.

Fourth, many state courts allow punitive damages to be covered by insurance, although still maintaining that the purposes of such damages are deterrence and punishment. *See, e.g., Lazenby v. Universal Underwriters Ins. Co., supra; see generally* Annot., *Liability Insurance Coverage as Extending to Liability for Punitive or Exemplary Damages,* 20 A.L.R.3d 343 (1968). Such a position is inconsistent at best. The same kind of inconsistency is exemplified by those states which allow punitive damages against employers even when they have in no way participated in or ratified the wrongful act of the employee. It is done purely on the basis of vicarious liability. In such cases, practically speaking, there can be no deterrence. *See generally* Ghiardi, at 410–20.[4]

Fifth, if the threat of compensatory damages is not sufficient to deter the defendant from future actions, the plaintiff can resort to equity and ask for injunctive relief. Failure to comply with an injunction gives rise to contempt proceedings and the defendant can be fined or jailed if, in the wisdom of the court, such measures are found necessary. Redden, § 7.6(A), at 627.

Some say punitive damages should be awarded to punish a defendant for antisocial behavior. This concept ignores the traditional distinctions between civil and criminal law,

---

[4]An example of this is noted in Long, *Punitive Damages: An Unsettled Doctrine,* 25 Drake L. Rev. 870, 873 (1976). In a recent case punitive damages of $11 million were awarded against the owner–developer of an apartment complex when a member of a furniture moving crew brutally raped and murdered a young mother. The crew was employed by a subsidiary of a firm with whom the corporate owner of the complex had contracted for servicing of the apartment buildings.

however. Civil law seeks to redress wrongs by having the one who causes injury through fault make the victim whole through compensation or restitution. On the other hand, it is the criminal law whose primary function has been punishment. As stated in Harno, *Cases and Materials on Criminal Law Procedure* 9 (1950), quoted in Redden, at 625–26:

> The difference between civil law and criminal law turns on the difference between the two different objects which the law seeks to pursue—redress or punishment. The object of the civil law is the redress of wrongs by compelling compensation or restitution: the wrongdoer is not punished, he only suffers as much harm as is necessary to make good the wrong he has done. The person who has suffered gets a definite benefit from the law, or at least he avoids a loss. On the other hand, in the case of crimes, the main object of the law is to punish the wrongdoer; to give him and others a strong inducement not to commit the same or similar crimes, possibly to reform him, possibly to satisfy the public sense that wrongdoing ought to meet with retribution.

Thus, the anomalous character of punitive damages becomes immediately clear. W. Prosser, *Torts* § 2, at 9 (4th ed. 1971); Ghiardi, at 418; Redden, § 7.5(D), at 623.

Ignoring this traditional distinction causes innumerable problems. Even though the defendant is presumably being punished on behalf of the public the "fine" imposed goes to a private litigant as a windfall.[5] The amount of this "fine"

---

[5]A frequently quoted observation on this point was made by the Wisconsin Supreme Court in *Bass v. Chicago & Northwestern Ry.,* 42 Wis. 654, 672 (1877):

It is difficult on principle to understand why, when the sufferer by a tort has been fully compensated for his suffering, he should recover anything more. And it is equally difficult to understand why, if the tortfeasor is to to be punished by exemplary damages, they should go to the compensated sufferer, and not to the public in whose behalf he is punished.

The anomaly of this was noted in Long, 25 Drake L. Rev., at 888. To the extent punitive damages fall on private or public enterprises, either directly or vicariously, the economic burden is highly likely to be passed along to the public. The public, then, is in the peculiar and indefensible position of penalizing itself with the payment going as unjust enrichment to someone for whom the law,

is fixed only by the discretion of the jury, subject to some sort of amorphous review by appellate courts.[6] Further, all the procedural safeguards attendant upon a criminal proceeding, such as proof beyond a reasonable doubt, right to counsel, the privilege against self–incrimination, the invalidity of vague laws, and even the rule against double jeopardy are absent.[7] The "fine" assessed need have no reasonable relationship to the criminal penalty for the same act, even though that sanction was established by the legislature to suit the nature of the crime. *See, e.g., Brooks v. Wootton,* 355 F.2d 177 (2d Cir. 1966) (punitive damages of $6,500 where criminal penalty was $25 plus loss of driver's license).

As stated by Ghiardi, at 419:

> If the defendant's actions do amount to a crime, then the criminal court is obviously the area wherein society's vindication best lies. If the actions of the defendant do not constitute a crime, then he simply should not suffer punishment. Thus, if the defendant's conduct has not been of such character as to evoke society's criminal sanctions, if the community has not previously seen fit to call for punishment of such acts, then there is clearly no reason why a jury may enact and enforce punitive measures on an ad hoc basis.

*See also* Redden, at 626–27.

---

through the medium of compensatory damages, already fully provides.

[6]This should be compared to a criminal law in which conviction of possession of large amounts of marijuana or cocaine subjected one to fines which had no maximum ceiling. This was recently held unconstitutional as being violative of due process. *State v. LeCompte,* 29 Crim. L. Rep. 2259 (La. 1981).

[7]*See* Ford, *The Constitutionality of Punitive Damages, in the Case Against Punitive Damages,* Monograph—The Defense Research Institute, Inc., at 15–22 (1969). He concludes:

"A punitive damages award, in purpose and effect, metes out individual punishment and aims at protecting society by deterring the offender and others from similar acts. An award of punitive damages is in substance a criminal penalty without the safeguards required by the Constitution of a criminal proceeding. Reason and justice demand the declaration of the unconstitutionality of the doctrine of punitive damages." *Id.* at 22.

Further, it is the criminal law which is best suited to achieve society's ends regarding limitation of antisocial activity, whatever that end may be—punishment, deterrence or rehabilitation. The criminal court has the needed flexibility in sentencing, the extensive experience with wrongdoers, and the staff of parole, probation and other experts necessary to deal with malefactors. Redden, at 626. Civil juries are not skilled at or qualified to determine what the amount of punishment of a wrongdoer should be. *See* Morris, *Punitive Damages in Tort Cases*, 44 Harv. L. Rev. 1173, 1179–80, 1189 (1931). If the criminal law has failed to protect society then the deficiency should be remedied by improving the administration of criminal justice, rather than making an end run around the safeguards of the criminal system and providing bounties at the expense of the tort–feasor.

Perhaps the concept of punishment in civil actions is best summarized in *Fay v. Parker,* 53 N.H. 342, 382, 16 Am. Rep. 270, 319–20 (1873), quoted in Redden, at 627:

> How could the idea of punishment be deliberately and designedly installed as a doctrine of civil remedies? Is not punishment out of place, irregular, anomalous, exceptional, unjust, unscientific, not to say absurd and ridiculous, when classed among civil remedies? What kind of a civil remedy for the plaintiff is the punishment of the defendant?

Or, as stated in *Spokane Truck & Dray Co. v. Hoefer,* 2 Wash. 45, 53, 25 P. 1072 (1891): "Surely the public can have no interest in exacting the pound of flesh."

Some say punitive damages are justified because they induce persons injured by antisocial conduct to bring suit when it would not be worthwhile to do so if only compensatory damages could be awarded. This justification is also subject to numerous criticisms.

Even if the use of punitive damages does result in suits against wrongdoers who would otherwise go unadmonished, it does not necessarily follow that the practice is desirable. Inadvisedly severe admonition in many cases may be too

great a price to pay for prosecution of a few wrongdoers who might otherwise escape. Further, it is questionable whether it is either necessary or proper to induce people to become more litigious.

In addition, punitive damages in cases of this sort are the exception rather than the rule. Plaintiffs in the case at bar had adequate inducement to sue the defendants without the "brass ring" of punitive damages being available. That such damages might be required to induce suit in some other cases still does not justify them in all cases. And in many of these cases there are other remedies available, such as injunctions or, if the behavior is truly egregious, suits for tort of outrage with its attendant liberal damage rules. *Grimsby v. Samson,* 85 Wn.2d 52, 530 P.2d 291 (1975).

In addition there are many practical problems with the application of punitive damages. Appellate review of punitive damage verdicts is difficult at best. One of the most frequently stated rules is that the punitive damage award must bear some relationship to the actual damages incurred, although the proper ratio is seldom mentioned. *See, e.g., Finney v. Lockhart,* 35 Cal. 2d 161, 164, 217 P.2d 19 (1950); *Wetherbee v. United Ins. Co. of America,* 18 Cal. App. 3d 266, 95 Cal. Rptr. 678 (1971); *see generally* Redden, at 62–65. But, as effectively pointed out in Morris, *Punitive Damages in Tort Cases,* 44 Harv. L. Rev. 1173, 1182 (1931), the ratio test, if it is actually used, seems to be an impediment to the alleged purposes of punitive damages rather than a good legal tool. For, if the purpose is to admonish a wrongdoer and forestall similar conduct in the future, then the actual damages in the present case are irrelevant. The only relevant factor would be the probable result of similar behavior in the future; if the probable result would be serious injury the behavior would be deserving of more admonition than if the probable result were only inconsequential damage. Thus, the author concludes, if the ratio test "has any effect at all, it may limit punitive damage awards when they should be severe, and result in heavy punitive damages when they should be

lenient." *See also* Note, *The Reasonable Relation Rule,* 9 Pac. L.J. 823 (1978).

This court has no practical experience in evaluating the propriety of the jury's determination of punitive damages. Amorphous, general concepts voiced by other courts, oftentimes clearly result oriented, do not make this task any easier. Further, will it be necessary for us, in each case, to employ a different standard of appellate review depending upon which state's law is applied?

Another problem with punitive damages which has surfaced since *Spokane Truck* is that they do not fit into litigation where numerous plaintiffs sue the same defendant for compensatory and punitive damages arising out of one "mass disaster." As pointed out in Long, 25 Drake L. Rev., at 887:

> If the early litigants win substantial punitive as well as compensatory damages, the later, and possibly equally deserving, litigants may not even collect their compensatory awards. The reason is that the defendant by that time may have run out of insurance and corporate assets because of the large number of claims. Justice that awards early comers so bountifully and leaves late comers with only hollow remedies may not be justice at all, the argument runs.

Judge Friendly recognized this in *Roginsky v. Richardson–Merrell, Inc.,* 378 F.2d 832, 841 (2d Cir. 1967), and refused to affirm the district court's award of punitive damages in one of the MER/29 cases.

Another basic problem is that, if punitive damages are indeed aimed at adequate (but not excessive) punishment and deterrence, "the use of the self interest of plaintiffs as motive power for private prosecution of wrongdoers may result in over–severity, rather than effective admonition. For the same self interest which leads plaintiffs to ask for punitive damages may also prompt them to seek high damages rather than admonition which will best serve the general interest in future security." Morris, 44 Harv. L. Rev., at 1206. Juries are not equipped or trained to determine what the proper punishment is in attempting to fix penal-

ties which will make for effective working of the admonitory function.

Additionally, there are the problems of insurability against punitive damages alluded to earlier. This may very well cause unexpected difficulties in the future.

Finally, I do not consider it in any way "unfair" to plaintiffs to deny punitive damages in this state even when allowed under otherwise applicable foreign law. Plaintiffs here were well aware of this state's long–standing policy of prohibiting those punitive damages not authorized by statute, yet they chose this forum. Given the existence of long–arm statutes plaintiffs generally have the ability to obtain jurisdiction and bring suit in other states whenever there is some minimal contact, much less a significant contact, with that state. California courts in particular have made it clear that they will not dismiss punitive damage suits involving a Washington party for reasons of forum non conveniens, recognizing that punitive damages are contrary to the public policy of this state. *Brown v. Clorox Co.,* 56 Cal. App. 3d 306, 312, 128 Cal. Rptr. 385 (1976). Plaintiffs chose this forum; they should not be heard to complain about its determination of public policy.[8]

In sum, punitive damages are unsound in principle and properly not awarded by Washington courts. I agree with Redden, at page 634, who concludes:

> [T]he four minority jurisdictions, which reject punitive damages, represent what should be the future trend of the law.

This state should not import such unsound, illogical, anachronistic, unfair laws when to do so would be to violate a long–standing public policy of our state and erode the heretofore firm foundation for excluding nonstatutorily

---

[8]As noted in *Higgins v. Central New Eng. & W. R.R.,* 155 Mass. 176, 181–82, 29 N.E. 534 (1892): "If, in the action prosecuted here, neither the expenses of the suit nor exemplary nor vindictive damages can be recovered, that fact is no hardship upon the defendant. There is no reason why the plaintiff may not be allowed to waive those elements of damage, by bringing his action in a forum where they cannot be allowed."

authorized general, unlimited punitive damages. Therefore I respectfully dissent.

BRACHTENBACH, C.J., concurs with STAFFORD, J.

Reconsideration denied January 5, 1982.